SIMPSON v. FIRST NAT. BANK OF DENVER.

(Circuit Court of Appeals, Eighth Circuit. March 27, 1899.)

No. 1,007.

SALE OR MORTGAGE—TRANSFER OF PROPERTY BY DEBTOR TO CREDITOR—PRESUMPTION.

When a mortgagor transfers to his mortgagee by the same transaction large portions of his real and personal property, by a deed of the real estate and by a bill of sale of a part and a pledge as collateral security of another portion of his personal property, and the considerations recited in the deed and the bill of sale are less than one-half of the value of the property described in them, the presumption is that the relation of mortgagor and mortgagee continued, and that the conveyances were made by way of security; and the burden rests upon a creditor, who claims that the deed and the bill of sale evidence absolute sales, to overcome this presumption, and establish that fact by substantial and persuasive evidence.

Appeal from the Circuit Court of the United States for the District of Colorado.

T. J. O'Donnell (Milton Smith, on the brief), for appellant.
Charles J. Hughes, Jr., for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This is an appeal from a decree which dismissed a bill exhibited by the appellant, Simon M. Simpson, against the First National Bank of Denver, the appellee, for an account of the proceeds of certain personal property, which the appellant alleged that he had transferred and delivered to the bank as collateral security for the payment of his indebtedness to it. On March 2, 1887, Simpson owed the bank $33,685.31. He owned three lots and a house, in which he lived, which were worth about $12,500; a stock of cigars, pipes, and other articles used by smokers, and some fixtures in a store in Denver, which were worth about $21,000; and a large stock of cigars and tobacco in the United States bonded warehouse in that city, on which the duties had not been paid, and which were represented by bills of lading, and were worth about $25,000. For the sake of brevity, we shall call the house and lots the "residence," the stock of cigars, smokers' articles, and fixtures in the store the "store," and the stock of cigars and tobacco in the bonded warehouse the "bonded goods." David S. Moffat was the president, S. N. Wood was the cashier, and H. Z. Salomon was a brother of a former director, and a customer of the bank, who was engaged in the grocery business in Denver, and was familiar with all the facts relative to this transaction as they occurred. On March 2, 1887, Simpson told Wood that he was insolvent, and that he was willing to secure the payment of his indebtedness to the bank; and thereupon, under Wood's direction, he deeded the residence to him, conveyed the store by a bill of sale and delivered it to him, and assigned the bills of lading of the bonded goods to the bank as security for $23,000 of his debt, for which amount he gave new notes on that day. The consideration recited in the deed was $7,500, and the consideration recited in the bill of sale was the same amount. For this deed and bill of sale he was given a credit of $15,000 on the books of the bank, and he was given a credit of $23,000 for his new notes, making his credit, in all, $38,000. This credit paid his overdraft and his old notes, and left a balance of $4,314.69 to his credit still. For this balance, the bank issued its certificate of deposit, but made it payable to its president, Moffat, instead of to Simpson, and Moffat retained it in the bank. It was never delivered to Simpson, but in November, 1888, it was canceled, and credited to profit and loss on the books of the bank, as an offset to a note of $5,000, which had been made long subsequent to March 2, 1887, by the Only Chance Mining Company, a corporation of which Simpson was treasurer and manager, and which had been indorsed by Simpson.

It is conceded by the bank that the bonded goods were assigned to it as collateral security for the new notes for the sum of $23,000, which was a part of Simpson's old debt of $33,685.31. The controversy was over the store. The appellant alleged in his bill that this was assigned and conveyed as security for his debt, and he now insists that the residence and the store, as well as the bonded goods, were transferred to secure his entire debt. On the other hand, the bank maintains that it bought the residence and the store outright, for $7,500 each. The appellant did not charge, in his bill, that the residence was conveyed as security; so that the nature of the title to it

which the bank acquired arises incidentally. The real issue is whether the transfer and delivery of the store to Wood was a purchase thereof by the bank for $7,500, or an assignment of it to the bank in trust, to sell and to apply the proceeds to the payment of Simpson's debt, and to return the surplus to him. Upon this issue only two witnesses testified, Simpson and Wood, and their testimony is irreconcilable. We are therefore remitted to the surrounding circumstances, and to the acts of the parties while they were disposing of this property, for convincing evidence of the truth. The written instruments made by the parties at the time generally constitute persuasive, if not controlling, proof on such an issue; but they are of slight significance here, because it is conceded on all hands that they do not evidence the truth. The deed and bill of sale, and the entries in the account books of the bank, show that Wood bought the residence for $7,500, that he bought the store for $7,500, that he paid Simpson $15,000 for them, and that Simpson paid this money to the bank; but Wood testified that he had no idea of taking the store or of assuming the payment of $7,500 to the bank on account of it, that in all his transactions with Simpson he was really acting for the bank, and that $10,-685.31 of the $15,000 was a credit to Simpson on his debt to the bank, while the balance, of $4,314.69, was not paid to Simpson at all at the time, but was put into the form of the certificate of deposit we have mentioned, payable to the order of the president of the bank, and was left in his hands to cover any contingencies that might arise. Courts of equity look through the form into the actual character of a transaction (Marshall v. Thompson, 39 Minn. 137–142, 39 N. W. 309, and cases there cited), and it clearly appears from the testimony of the witnesses for the bank that this transaction was in fact between a debtor and his creditor, between Simpson and the bank, and that the deed and the bill of sale were not, as they appeared to be, conveyances to a purchaser who was a stranger, but to the creditor, the bank. It is not claimed that the bank was forbidden to become a purchaser because it was a creditor; but where the relation of debtor and creditor, or of mortgagor and mortgagee exists, and conveyances are made, or property is delivered by the debtor to the creditor, the legal presumption is that the relation continues, and that the transfers were made as further security for the debt. Marshall v. Thompson, 39 Minn. 137, 140, 39 N. W. 309; Holridge v. Gillespie, 2 Johns. Ch. 33; Holmes v. Grant, 8 Paige, 243, 251; Clark v. Henry, 2 Cow. 324; Hone v. Fisher, 2 Barb. Ch. 559.

When the arrangement for these conveyances was made, the relation of debtor and creditor, and the relation of mortgagor and mortgagee, existed between Simpson and the bank. He owed it $33,685.31, and Wood held his deed of the residence as security for this debt. Before entering upon a discussion of the disposal of the store, we will briefly indicate the facts proved with reference to the residence. The old deed, which Wood held to secure the bank, had never been recorded. It was destroyed, and a new deed, dated March 2, 1887, reciting the consideration of $7,500, was made to Wood, and recorded. The familiar rule, "Once a mortgage, always a mortgage," left the presumption that this second deed was a mere security for the debt

so strong that convincing evidence was required to overcome it. But the only evidence produced was that of Wood, and this was contradicted by that of Simpson. The subsequent treatment of this real estate by the bank does not strengthen Wood's testimony. On its account books, real estate was charged with $7,500 on account of the residence, in accordance with the theory of a purchase; but on November 19, 1888, real estate was charged with $5,000 more on account of this property, and on the same day a note of Simpson's corporation, the Only Chance Mining Company, was paid. It is difficult to resist the conclusion that this note was paid by this residence property, and this inference seems to be strengthened by the fact that on January 16, 1889, the residence was sold for $9,000 cash, or its equivalent, and for other lots worth $3,500, and real estate was credited with $12,500, the sum of $7,500 and $5,000, on account of it. This account strongly indicates that the bank considered the interest of Simpson in the residence sufficient, in November, 1888, more than 20 months after it claims to have purchased it, to pay a debt of $5,000 due to it from his corporation. We will not pursue the discussion of the title to this property further. The fact that it was already mortgaged to the bank when the deed of March 2, 1887, was made, the fact that the consideration recited in that deed was $5,000 less than the value of the property, and the fact that 20 months later the bank appears to have used Simpson's interest in it to pay an obligation of his corporation for $5,000, militate strongly against the testimony of Wood that the bank bought the property outright.

We turn to the consideration of the main question,—whether the store was bought by the bank for $7,500 or transferred to it as security for Simpson's debt. When the agreement of March 2, 1887, pursuant to which the bill of sale, the deed, and the transfer of the bonded goods were made, was discussed, H. Z. Salomon was present. Wood took possession of the store on the same day that the bill of sale was made. He immediately proceeded to pay the duties on the bonded goods, and turned them over to Salomon, who, with the aid of Simpson, sold them and accounted to the bank for the proceeds. On March 5, 1887, three days after he received his bill of sale, Wood transferred and delivered the store to Salomon, and took his promissory note for $7,500, signed "H. Z. Salomon C. S." "C. S." indicated "cigar store." The bank claims, and Wood testified, that this was an absolute sale of the store to Salomon for $7,500. At this time, Salomon was in active business as a grocer in the city of Denver, was in good credit, and had an individual account with the bank. He opened another account with this bank, in the name of "H. Z. Salomon Cigar Store." In this account he deposited indiscriminately the proceeds which he realized from the store and those which he received from the bonded goods. On March 25, 1887, Salomon, Simpson, and Wood sold the store to one Hyman for about $21,000, and deposited the proceeds of this sale in Salomon's cigar-store account. Simpson showed the goods and assisted to negotiate the sale; Wood fixed the amount of cash required of the purchaser, Hyman, and the time and terms of his deferred payments; and Salomon or Wood re-

ceived the notes and cash from the purchaser, and deposited them in Salomon's cigar-store account. Just before the deposit of the proceeds of this sale was made, the cigar-store account was overdrawn more than $5,000. Immediately after this deposit was made, there was a balance of more than $15,000 to its credit. Thereupon, and on the same day, Salomon checked out of this account, and paid over to Wood, for the bank, $12,660.35. Of this amount, $7,543.05 was applied to the payment of Salomon's cigar-store note of $7,500, which he made when he took the store, and $5,117.30 of it was indorsed on Simpson's notes for $23,000, which he made on March 2, 1887. More than $3,500, and probably all of this $5,117.30 so indorsed on Simpson's note, was a part of the proceeds of Salomon's sale of the store to Hyman; and Wood knew it. It is certain that it could have come from no other source, because up to that day Salomon had not received from the bonded goods as much as he had expended on their account, and, while he deposited $21,700.64 on that day, only $1,314.88 of it appears to have come from the bonded goods. At this time, Wood had paid out, for duties and for freight on the bonded goods, much more than he had received from them; so that the proof is conclusive that the larger part of the $5,117.30 paid over to the bank on Salomon's cigar-store check, 20 days after it claims that it had sold this store to Salomon, was the proceeds of the sale of that store to Hyman, and was received, and applied by its cashier, as Simpson's money, in part payment of Simpson's notes. After the sale of the cigar store Salomon continued to sell the bonded goods, to deposit their proceeds in his cigar-store account, and to pay over to the bank from time to time the amounts which he realized. Out of the funds deposited in this account, he paid over to Wood, for the bank, $10,000 on May 13, 1887, $5,000 on August 4, 1887, and $4,649.10 on October 5, 1887. The payments of $10,000 and $5,000 were credited on Simpson's notes, and Wood used $4,246.68 of the payment of October 5, 1887, to make the final payment on the last of them. This was done on October 5, 1887. After Simpson's notes were paid, according to the indorsements upon them, and according to the entries in the books of the bank, Salomon and Wood agreed that Salomon was entitled to $2,000 for his services in this matter; and on October 14, 1887, he checked $2,000 out of his cigar-store account, and deposited it in his individual account, in payment of his services. There are many minor facts and circumstances which we cannot stay to recite, and many subordinate issues upon which the testimony is conflicting and its effect doubtful; but the salient facts to which we have adverted are either admitted by the parties or established by the evidence beyond doubt or cavil.

The court below presumably found that the store was sold to the bank for $7,500, for it dismissed the bill; and we have examined this record in view of the rule that where the court below has considered conflicting evidence, and made its finding and decree, they are presumably correct, and should be permitted to stand unless an obvious error has intervened in the application of the law, or

some serious or important mistake has been made in the consideration of the evidence. Warren v. Burt, 12 U. S. App. 591, 600, 7 C. C. A. 105, 110, 58 Fed. 101, 106. But the more carefully we have read this record, and the more critically we have analyzed the evidence it contains, the more forcibly has the conclusion been borne in upon our minds that there never was any sale of this store to the bank. To constitute a sale of this property to the bank, something more than a mere bill of sale to its cashier was required. A bill of sale, without more, would necessarily have the effect to charge the bank with the fair value of the property. To make a sale, there must be an agreement of sale, a meeting of the minds of the parties on its terms, and a performance of the agreement. Now, the burden of establishing this agreement, of proving this meeting of the minds of the parties, was upon the bank. Not only this, but the relation of debtor and creditor, and the relation of mortgagor and mortgagee, existed between Simpson and the bank before and at the time of the transaction of March 2, 1887; so that there was a legal presumption that these relations continued, and that any transfers or conveyances of property from the debtor to the creditor were made, not in payment of, but as further security for, the debt. It necessarily follows that a bare preponderance of evidence of an agreement of sale was insufficient to discharge the burden which rested upon the bank. Substantial and persuasive evidence of the meeting of the minds of the parties upon the terms of the sale was required to overcome the legal presumption, and to establish the fact. This requirement was not met by the testimony for the bank. It produced but one witness to the contract, and he was contradicted by the appellant. Thus, the sale was left upon the oral testimony, with the legal presumption against it, and no preponderance of testimony in its favor. When we look beyond the oral testimony, when we read and analyze the entire evidence, we find the acts of the parties, which generally speak louder and more truthfully than their words, inconsistent with the theory of a sale, and explicable only on the supposition that the residence and the store were transferred to secure, and not to pay, the debt. If the residence and the store were sold, the consideration paid would naturally have been nearly the fair value of the property. If they were transferred as security, the consideration would be immaterial, and would, perhaps naturally, bear little relation to the actual value of the property. The theory of the bank is that Simpson sold to it, in payment of his debt, the residence, worth $12,500, for $7,500, and the goods in his store, worth $21,000, for $3,185.31. We do not overlook the fact that the bank contends that the nominal consideration for the store was $7,500, but we also remember that it concedes that it put all but $3,185.31 of this consideration in the certificate of deposit, to which we have repeatedly referred, which was payable to the order of its president, and was kept in the bank, as Wood says, "to cover any contingencies that might arise." Frequent and repeated efforts have done much to strengthen our faith, but it is too tense a strain on our credulity to believe that this debtor sold property worth $33,-

500 to his creditor for $15,000, and then turned over $4,314.69 of this consideration, which was due him in cash, to secure his purchaser against any contingencies that might arise.

It was a wise and reasonable precaution for Salomon to open a separate account with the bank under the name of "H. Z. Salomon Cigar Store," and to place in that account the proceeds of the bonded goods which the bank held as collateral security to Simpson's debt, and which Salomon was selling for it. He held these goods and their proceeds in trust for the bank, and duty and wisdom alike required that they should be kept separate from his individual property and money. If the bank sold the store to Salomon outright on March 7, 1887, when Wood delivered it to him, the consideration would naturally have been about the value of the goods in the store. It would naturally have been paid by Salomon out of his own money, and not out of the funds he held in trust for the bank, and the proceeds which he subsequently derived from the sale of it would in the usual course of business have been deposited to the credit of his individual account, and would not have been mixed with the trust funds in his cigar-store account. On the other hand, if the store was held, like the bonded goods, as security for Simpson's debt, and Salomon was acting as the agent of the bank to sell it, the amount of the consideration of its transfer to him was immaterial, and might well bear little relation to the actual value of the property. That consideration would naturally have been paid out of the trust funds held by Salomon for the bank, or would not have been paid at all, and all the proceeds of the store, after it had been transferred to Salomon, would rightfully and in the usual course of business have been kept among the trust funds in the cigar-store account, and not in the individual account of Salomon, because they would have been the property of the bank and of Simpson, and not the property of Salomon. Now, what was actually done? The value of the store was $21,000. The consideration of its transfer to Salomon was $7,500, a little over one-third of its value. This consideration was not paid by Salomon from his individual account, or out of any property or money of his own. He gave a note for it, signed "H. Z. Salomon C. S.," and he paid that note out of his cigar-store or trust-fund account on March 25, 1887, when he sold the store to Hyman for about $21,000. He did not deposit the proceeds of the sale of the store to Hyman in his individual account with his own moneys, but he deposited it in his cigar-store or trust-fund account, and he checked out of this trust-fund account largely, and probably entirely, from the proceeds of the sale of this store on that day, and paid over to the bank $5,117.30, which Wood received and indorsed on the notes of Simpson for $23,000, with full knowledge of the source from which it was derived. Could demonstration be more perfect, or proof more conclusive, that through all its transfers, until Hyman bought it, this store remained a part of the security for Simpson's debt, exactly as did the bonded goods? It was managed and sold by the same agent of the bank. The proceeds derived from its final sale to Hyman were placed in the same

trust-fund account, and were applied to the payment of the same debt of Simpson. The amount of the alleged consideration for the pretended sale from Simpson to the bank, and from the bank to Salomon, was less than two-fifths of the actual value of the property. Salomon never paid any part of the pretended consideration for the transfer of the store to him, but merely gave a note for it to the bank, which he subsequently paid with the bank's money out of the proceeds of the store which he held in trust for it. We will not further extend the discussion of the evidence presented in this case. We think we have sufficiently stated the reasons why we are unable to resist the conclusion that this store never was sold to the bank or to Salomon, but was transferred to and held by them in trust to secure the debt of Simpson to the bank until they finally sold it to Hyman. The result is that the appellant is entitled to an accounting of the moneys received and the expenses incurred by the bank in the management and disposition of the store, as well as in the management and disposal of the bonded goods, and, as this was denied him in the court below, the decree which dismissed his bill must be reversed.

In the briefs of counsel there is some discussion regarding the basis of the accounting, but as the account has not been stated, and as it is probable that the evidence upon which it will rest is not all before us, we deem it unwise to enter upon any extended consideration of the suggestions presented. It is sufficient to say that the objection of the appellee to the maintenance of this suit, because the appellant assigned his interest to third parties in the balance due him on the accounting to the amount of $5,000, is untenable, because it does not appear that the surplus due him does not exceed $5,000, and that the objection of the appellant to the allowance to the bank of such amounts as in the exercise of sound judgment and reasonable prudence it expended to defend its title to the trust property against the attacks of third parties, or to compromise actions brought against it on account of this property, is equally baseless. We defer the discussion of the items of the account until all the evidence shall have been taken, presented to, and considered by the court below. The decree below is reversed, and the case is remanded to the circuit court, with directions to enter a decree that the appellant is entitled to an accounting of the proceeds received and expenditures made by the bank and its agents, Wood and Salomon, in the management and disposition of the store and the bonded goods.