SIMPSON v. FIRST NAT. BANK OF DENVER.

FIRST NAT. BANK OF DENVER v. SIMPSON.

(Circuit Court of Appeals, Eighth Circuit. March 22, 1904.)

Nos. 1,828, 1,829.

1. APPEAL—ASSIGNMENT OF ERRORS—FILING BEFORE ALLOWANCE OF APPEAL INDISPENSABLE.

The filing of an assignment of errors before or at the time of the allowance of an appeal is indispensable, under the eleventh rule of the Circuit Courts of Appeals (91 Fed. vi, 32 C. C. A. lxxxviii), and the appeal will be dismissed if the assignment is not thus filed.

2. SAME—CONDITIONAL ALLOWANCE.

An allowance of an appeal on condition that the petitioner give a bond in a fixed amount does not become an allowance of the appeal until the bond is given and accepted, and the filing of an assignment of errors before or at the time of the giving and acceptance of the bond is a filing within the time prescribed by the rule.

3. APPEAL MATTER OF RIGHT—ALLOWANCE OF WRIT OF ERROR MATTER FOR JUDICIAL DETERMINATION.

An appeal is a matter of right, secured by act of Congress upon compliance with the statutes relative to security and with the rules of the courts.

The allowance of a writ of error is a matter for judicial determination upon a consideration of the sufficiency of the grounds for the writ stated in the petition and assignment of errors.

The reason for the rule requiring the filing of an assignment of errors before the allowance of an appeal is to give notice to opposing counsel and the appellate court of the questions of law to be discussed. In an action at law there is the additional reason that the presentation of an assignment of errors to the judge who allows or issues a writ of error is essential to his decision of the question whether or not it should be issued.

4. EVIDENCE—ACCOUNT—EACH SIDE PRIMA FACIE EVIDENCE OF ITS CONTENTS.

The introduction in evidence without qualification of an account containing debit and credit items makes each side evidence of its contents.

In the absence of all other evidence, the debits and credits of such an account offset each other, and the account proves its balance only. An admission must be taken with its qualifications as an entirety.

But where there is other evidence the court or jury is not required to give equal credit to each side of the account, to the admissions against interest, and to the self-serving statements contained in it. They may, and they should, determine the fact for or against the evidence contained in the account as the preponderance of all the evidence in the case and the rules of law require.

(Syllabus by the Court.)

Appeals from the Circuit Court of the United States for the District of Colorado.

See 93 Fed. 309, 35 C. C. A. 306; 115 Fed. 1019, 52 C. C. A. 683.

Simon M. Simpson exhibited his bill against the First National Bank of Denver to procure an accounting from it of the proceeds of certain personal property, which he averred that he had pledged to the bank to secure his indebtedness to it. The bank denied that a portion of the goods were pledged, and alleged that its cashier had bought and paid for them. A decree to that effect was rendered in the court below, and this suit was dismissed. Upon an appeal to this court that decree was reversed, and the case was remanded to the court below, with directions to take an account of the proceeds of all the personal property which the complainant claimed to be pledged. That account

129 F.—17

has been taken, and a decree has been rendered upon the accounting. Each of the parties to the suit has appealed from this decree.

T. J. O'Donnell, for plaintiff.

Charles J. Hughes, Jr. (Barnwell S. Stuart, on the brief), for defendant.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

SANBORN, Circuit Judge (after stating the facts as above). The first question which the record in this case presents is whether or not the assignments of error were filed in such time that the merits of the case may be reviewed in this court. On June 23, 1902, each of the parties to this suit prayed in open court for an appeal from the decree, and orders were made that the appeal of the defendant was allowed, "but upon the condition, nevertheless, that the respondent give bond on such an appeal in the sum of fifty thousand dollars ($50,000)," and that the appeal of the complainant was allowed, "but upon condition, nevertheless, that he give bond on said appeal in the sum of five hundred dollars ($500)." On August 15, 1902, the defendant filed an assignment of errors, an approved bond in the sum of $50,000, and a citation dated on that day. On August 20, 1902, the complainant filed an assignment of errors, an approved bond for $500, and a citation dated on that day. The bonds were approved and the citations were signed by the judge who heard the case and made the conditional orders of allowance of the appeals. In this way the question is presented whether or not an assignment of errors is filed at or before the allowance of the appeal, within the meaning of rule 11 of this court (91 Fed. vi, 32 C. C. A. lxxxviii), when it is filed at the time when the judge signs the citation and approves the bond which he has made a condition of the allowance of the appeal.

The acts of Congress provide that "there shall be annexed to, and returned with any writ of error for the removal of a cause at the day and place therein mentioned an authenticated transcript of the record, an assignment of errors and a prayer for reversal with a citation to the adverse party," and that "appeals * * * shall be subject to the same rules, regulations and restrictions as are or may be prescribed in law in cases of writs of error." Rev. St. §§ 997, 1012; 1 U. S. Comp. St. 1901, pp. 712, 716. Rule 11, so far as it is relevant to the question now under consideration, reads:

"The plaintiff in error or appellant shall file with the clerk of the court below, with his petition for the writ of error or appeal, an assignment of errors which shall specify separately and particularly each error asserted and intended to be urged. No writ of error or appeal shall be allowed until such assignment of errors shall have been filed."

The acts of Congress did not require the filing of an assignment of errors before the allowance of a writ of error or of an appeal. This requirement rests upon rule 11 of this court, which is the same in terms and in effect as rule 34 of the Supreme Court of the United States. There are two reasons for this rule: One is that the judge to whom the application for the allowance or issue of a writ of error·is presented may be informed what the alleged errors are upon which the petitioner

relies, so that he may intelligently decide the question whether or not the writ should be issued. The other is that opposing counsel and the appellate court may be informed by a statement which becomes a part of the record what questions of law are presented for their consideration and determination.

The first reason applies to the allowance of a writ of error only. It is inapplicable to the allowance of an appeal. The filing of the petition for a writ of error, with its accompanying assignment of errors, is the institution of a suit in the appellate court. The petition and the assignment set forth the grounds for the issue of the writ, and the duty of deciding whether or not these grounds are sufficient to warrant its issue, and of issuing or refusing to issue it in accordance with his decision of this question, is imposed upon the judge to whom they are presented.

It is not so in the case of an appeal. The right to appeal is an absolute right granted to the defeated party by the acts of Congress. No court or judge has any jurisdiction or power to condition the allowance of an appeal upon his consideration or determination of the question whether or not the applicant presents alleged errors which form reasonable grounds for the review of the decision below. That question is reserved for the consideration of the appellate court exclusively. The petitioner has the same right to the allowance of his appeal, in the absence of error or of the appearance of it, as when he presents the most conclusive reason for the belief that the decision against him was erroneous. The only question for the consideration of the court or of the judge to whom an application for an appeal is made is the sufficiency of the security offered for the costs and damages, or for the costs alone; and if the petitioner presents satisfactory security, and prays an appeal in accordance with the statute and the rules of the courts, the duty of the court or judge to whom he presents his application is imperative to allow it. Brown v. McConnell, 124 U. S. 489, 490, 8 Sup. Ct. 559, 31 L. Ed. 495; Pullman's Palace Car Co. v. Central Transp. Co. (C. C.) 71 Fed. 809. The result is that the assignment of errors is not required to be filed before an allowance of appeal for the benefit or information of the court to whom the application for its allowance is made. The only reason for its filing at that time is that the alleged errors upon which the petitioner relies may be made a part of the record for the information of opposing counsel and of the appellate court; and that object is as well attained by filing it at any time before the security is approved and accepted as by filing it before the order is made which allows the appeal only upon the giving of the security.

Again, no formal order of allowance of an appeal is requisite to its perfection. The acceptance of security in open court at the same time at which the decree challenged is rendered, or the acceptance of security and the issue of a citation by the proper court or judge at any proper time or place within the period limited for an appeal, in themselves constitute its allowance, without any other or further order regarding the matter. Sage v. Railroad Co., 96 U. S. 712, 715, 24 L. Ed. 641; Draper v. Davis, 102 U. S. 370, 371, 26 L. Ed. 121; Brandies v. Cochrane, 105 U. S. 262, 26 L. Ed. 989; National Bank v. Omaha, 96 U. S. 737, 24 L. Ed. 881.

What, then, in the light of these principles and rules, was the legal effect of the orders of the court below, made on June 23, 1902, to the effect that the appeals of these parties should be allowed upon condition that they give bonds in the amounts there specified? That court had no jurisdiction or power to determine whether or not the appeals of these parties should be allowed if the applicants complied with the rules of the court and gave the security required by the acts of Congress. If they effected this compliance and the court accepted their security, its further order allowing or disallowing their appeals would be utterly futile. Their appeals would be as effective, upon their compliance with the rules and upon the acceptance of their security, if the court made an order that they were disallowed, as they would be if it made an order that they were allowed. The only judicial discretion and the only function of the court upon the application for the appeals was to determine the amount and sufficiency of the security which the parties were to present when they took them. This discretion it exercised. It fixed the amounts of the bonds, and it ordered that the appeals should be allowed upon the express condition that these bonds were given. If the bonds had not been given, that court would not have lost, and this court would not have gained, jurisdiction of this case. The appeals would not have been perfected, and the case would have remained in the Circuit Court. Draper v. Davis, 102 U. S. 370, 371, 26 L. Ed. 121; Aspen Mining & Smelting Co. v. Billings, 150 U. S. 31, 35, 14 Sup. Ct. 4, 37 L. Ed. 986.

The legal effect of the conditional orders of allowance, therefore, was exactly the same that the effect of an order that the amounts of the bonds for appeals were fixed at $50,000 for the defendant and $500 for the plaintiff would have been. Under such an order the acceptance of the bonds and the issue of the citations would have allowed the appeals, without any order of allowance whatever. Under the conditional order actually made the acceptance of the bonds and the issue of the citations could have no other effect. These acts allowed the appeals, and our conclusion is that the appeals were not allowed until the bonds were accepted. The orders of allowance were expressly conditioned upon the giving of the bonds, and until they were given and accepted the appeals were not allowed, because, until then, the conditions of their allowance were not fulfilled. As the assignments of error were filed before or at the time of the acceptance of the security and the issue of the citations, they were filed within the time fixed by rule 11 of this court and the merits of the cases presented by the appeals are open for our consideration.

The cases of Radford v. Folsom, 123 U. S. 725, 727, 8 Sup. Ct. 334, 31 L. Ed. 292, Brown v. McConnell, 124 U. S. 489, 490, 8 Sup. Ct. 559, 31 L. Ed. 495, and Hewitt v. Filbert, 116 U. S. 142, 6 Sup. Ct. 319, 29 L. Ed. 581, have been read and considered; but they do not appear to us to be inconsistent with the conclusion at which we have arrived. Neither of them presents a conditional order of allowance. It may be, as the Supreme Court held in Radford v. Folsom, that, where a bond is given and accepted under an order which absolutely allows an appeal and fixes the amount of the bond, that the appeal relates back to the date of the order of allowance, for the purpose of deter-

mining the term of the appellate court at which the case should be docketed. That question is not before us, and its decision either way does not determine the issue whether or not a conditional allowance becomes an absolute allowance before the condition is fulfilled. In Brown v. McConnell and Hewitt v. Filbert the Supreme Court in effect held that where an appeal is absolutely allowed and the case is docketed in that court, without the taking of security or without the issue and service of a requisite citation, that court has the power in its discretion to allow security to be given, or to issue a citation and permit it to be served, and then to proceed to hear the case upon the merits. But it is not perceived that these decisions answer the question whether or not an appeal, permitted only upon an express condition, is allowed before the condition is complied with. The opinions of this court have declared, and it is our purpose to adhere strictly to the rule which they announce, that rule 11 of this court is just and reasonable, that it will be enforced, and that under it we cannot consider or decide issues of law which are not raised by assignments of error filed before or when the writ of error or appeal is allowed. In actions at law the assignment of errors must be filed and presented to the judge before the writ of error is issued or allowed, because he must determine, from an examination of it and of the petition for the writ, whether or not they set forth any substantial grounds for the issue of the writ. Frame v. Portland Gold Min. Co., 108 Fed. 750, 47 C. C. A. 664; U. S. v. Goodrich, 54 Fed. 21, 22, 4 C. C. A. 160; Union Pac. R. Co. v. Colorado Eastern R. Co., 54 Fed. 22, 4 C. C. A. 161; City of Lincoln v. Sun Vapor Street Light Co., 59 Fed. 756, 759, 8 C. C. A. 253, 256; Flahrity v. Railroad Co., 56 Fed. 908, 6 C. C. A. 167; Crabtree v. McCurtain, 61 Fed. 808, 10 C. C. A. 86.

The rule applies with equal force to cases brought to this court by appeal. In Webber et al. v. Mihills, 124 Fed. 64, 59 C. C. A. 578, an appeal had been taken in a case in which the allowance was made on November 19, 1902, was absolute, and there was no claim or suggestion that it was not perfected on that day, so far as it could be completed without the filing of an assignment of errors. But the assignment was not filed until November 26, 1902. The appeal was dismissed because the assignment of errors was not filed before the appeal was allowed. The conclusion in the case at bar that the appeals here were not allowed until the conditions on which the court permitted them were fulfilled, and that the assignments of error were filed within that time, is consistent with the decision in the Webber Case. The opinion in Lockman, Adm'r, v. Lang et al. (filed November 30, 1903) 128 Fed. 279, was rendered upon what was then supposed to be a state of facts similar to those presented in Webber v. Mihills, and the decision followed the conclusion in that case. A re-examination of the record in the Lockman Case, however, discloses the fact that the order of allowance of the appeal in that case contained a condition similar to those in the orders in the case at bar. The order of allowance was conditioned upon the giving of the bond for $100, and when this bond was presented and accepted by the court a petition for a writ of error to which an assignment of errors was attached was filed with the trial court. A motion for a rehearing has been made in this court in that case, and the final decision of it

will be made to conform to the views which have been expressed in this opinion. We turn to the consideration of the merits of the case.

These are appeals from the decree of the Circuit Court upon the accounting directed by this court in Simpson v. First National Bank, 93 Fed. 309, 35 C. C. A. 306. In that case we found, from the evidence which had then been produced, that on March 2, 1887, Simpson owed the bank $33,685.31, and that for the purpose of securing the payment of this indebtedness he conveyed and delivered to S. N. Wood, the cashier of the bank, and to H. Z. Salomon, its agent, his house and three lots in the city of Denver, which were worth about $12,500, his stock of cigars, which was ·worth about $21,000 and was called the "cigar store," and his bonded goods, which were worth about $25,000, under an agreement with them that they should convert this property into money, pay the debt he owed to the bank, and return the surplus to him. The bank had admitted by its answer and testimony that Wood received the bonded goods for the purpose of securing the payment of $23,000 of the debt of Simpson to the bank, but it had alleged and claimed that Wood bought the house and lots for $7,500, which he applied in payment of Simpson's debt, and that he also purchased the cigar store for a like amount, which he also applied to the payment of the same debt and to the purchase of a certificate of deposit in the name of the president of the bank. The claims of the defendant that the transactions with Wood constituted a sale to him of the real estate and of the cigar store were not sustained by the proof; but as the complainant, Simpson, had not alleged that the real estate had been conveyed to secure his debt, and had not asked for an accounting of its proceeds, the conveyance of the house and lots to Wood and the reduction of the debt of Simpson by the application of the $7,500, which the bank alleged that Wood had paid for this real estate, was allowed to stand as a sale, and the Circuit Court was directed to take and state an account of the proceeds received and of the expenditures made by the bank and by its agents, Wood and Salomon, in the management and disposition of the store and of the bonded goods. This account has been taken, and the court below has found, and rendered a decree to the effect, that the bank has received from these goods $22,061.93 more than the sum of its expenditures and of the indebtedness of Simpson to it, and that the latter is entitled to recover this amount from the bank, with interest from January 19, 1893. Both parties have appealed from this decree. The alleged errors presented for our consideration by the bank will first be considered.

The cigar store was operated by Salomon from March 7 to March 25, 1887, when he sold it for cash and notes from which the bank realized $19,541.66. Salomon then proceeded to sell many of the bonded goods, which had been at first delivered to Wood by Simpson, and he concluded his relations with this transaction during the last days of January, 1888. During this time the bank kept an account with him, styled "H. Z. Salomon Cigar Store Account," in which Salomon deposited the proceeds of the sale of the store and of the bonded goods which he handled, and out of which he drew various amounts by checks or orders upon the bank. During the same time Wood, the cashier of the bank, was expending money to pay duties and freight

upon the bonded goods, and was selling to others and was himself collecting the proceeds of some of these goods. The proceeds which he obtained from these sales to others than Salomon he deposited in his individual account with the bank. Out of this account he checked the amounts which he paid for duties, freight, and other expenses incurred in disposing of the bonded goods. These two accounts, and much testimony concerning many of the items which appear in them and concerning the amount and character of the goods in the store and in bond, were introduced in evidence at the first hearing for the purpose of proving that the cigar store was pledged, but was not sold. In this state of the case, and after the decision of this court, the Circuit Court on June 8, 1899, ordered the accounting. The seventy-ninth rule in equity requires parties accounting to bring in their respective accounts in the form of debtor and creditor, and provides that any of the other parties to the proceeding who are not satisfied with the account shall be at liberty to examine the accounting party in the master's office. The burden and duty was therefore upon the bank to bring in an account in the form of debtor and creditor, which would show upon its face the items which the bank claimed it had received and those which it claimed to have rightfully expended on account of the store and of the bonded goods, together with the respective dates at which it received and paid them out. On October 22, 1900, more than a year after the accounting had been ordered by the Circuit Court, the bank had presented no account whatever to the master. Thereupon counsel for Simpson submitted to the master the evidence that had been taken at the first hearing, and asked that the accounting might be had upon that record. On March 21, 1901, counsel for the bank submitted an account upon which two of the items credited to Simpson were: "Balance ret'd by S. N. Wood from cigar store, $12,366.40. Collateral in hands of S. N. Wood sold, $26,273.82."

The items from which these balances were derived were not specified in the account, but witnesses for the bank by their subsequent testimony identified them. This account disclosed a balance due from Simpson to the bank of $9,813.17, and its witnesses testified that it was a correct statement compiled from its account books of all the moneys received and expended by it or by its agents on account of the store and the bonded goods. It had, however, stated in its original answer that Simpson owed the bank only $2,742.98, upon the theory which it then maintained that the store was not pledged, but sold, and that he was entitled to a credit of only $7,500 on account of the store, from which the bank actually received $19,541.66. At a later period during the hearing before the master the bank filed another account, verified by the testimony of one of its witnesses, which shows Simpson in debt to the bank in the sum of $42,466.67. This account contains an item of $10,500 for goods placed in the cigar store and of $22,230.86 interest, which appear here for the first time. Testimony was introduced which identified the items of receipts and expenditures on account of the pledged goods which passed through the individual account of Mr. Wood, and they stand in the master's report free from exceptions.

The first specification of error questions the action of the master and of the court below relative to the cigar store account. That account

practically balances. Some of the items which appear in it to the credit of the cigar store were explained and verified by testimony, and some were not. This is also true of the items charged against the cigar store in that account. The master, in making the statement of account upon which the decree below rests, charged the bank with the unexplained items on the credit side of that account, which amount to about $23,000, on the ground that they were admissions of the bank against its interest; and he refused to credit it with the unexplained items on the debit side, which amount to about $20,000. Upon this subject he said:

"By the decision of the Court of Appeals Mr. Salomon is held to be in this transaction the agent of the defendant, and this account must therefore be considered as the account of the bank; and the defendant must be charged with the entire amount of receipts as shown by the account, and can take credit only for such items of disbursement as are shown to be proper and necessary to the execution of the trust. There can be no reasonable doubt but a portion of the disbursements appearing on the account were expenses necessarily incurred in the transaction of the business, but they are not identified, nor the purpose of the expenditure shown."

This decision and action of the master was affirmed by the court below, and it is the subject of bitter complaint. The cigar store account was offered in evidence by the complainant upon the accounting as a part of all the evidence taken at the first hearing. It was a single account, composed of debit and credit items. There was testimony to the effect that Salomon deposited the proceeds of the pledged goods in the bank to the credit of the cigar store in this account, that he checked out of this account many thousand dollars to Wood, which the latter applied to pay the debt of Simpson, and that he used the moneys deposited in this account to run the business of the cigar store. This testimony was uncontradicted. This was an account between the bank and its agent, Salomon, and it was undoubtedly evidence that the bank received from Salomon, on account of the cigar store and on account of the bonded goods, the amounts which were credited to the store in that account, and that it paid out upon the orders or checks of its agent the amounts which are debited to the store therein. Where one introduces in evidence an admission, it must be taken in its entirety, with the qualifications which limit or destroy its effect. The whole admission, together with the limitations and qualifications it contains, must be taken together, because, unless these are all received, the true import and meaning of the admission may not be discovered, and the truth, which is the great object of the inquiry, may not be ascertained. But although the entire admission, including the parts favorable as well as the parts unfavorable to the party who makes it, must be received in evidence, they are not all necessarily equally conclusive or worthy of credit, and it is the province and the duty of the trior of the fact, in the light of all the evidence in the case, to determine how much of the entire statement he will believe and how much he will discredit. Greenleaf, Ev. § 201; Bristol v. Warner, 19 Conn. 7, 18; Kallman v. His Creditors, 39 La. Ann. 1089, 1090, 3 South. 382. This rule applies to statements of account which are introduced in evidence without qualification to secure the benefit of the admissions against interest which they contain. In the absence of all other evidence, each

side of such an account qualifies and limits the other. Both sides must be taken, weighed, and considered together. The items upon one side offset the items upon the other, and the account proves its balance only. Morris v. Hurst, Fed. Cas. No. 9,832; Bell v. Davis, Fed. Cas. No. 1,249.

But, where other evidence relative to the matters referred to in the account is presented for the consideration of the court or jury, they are not required to give equal effect to all parts of the account—to the admissions against interest and to the self-serving statements; but it is their province and their duty to consider each side of the account, together with all the other evidence germane to it, and to give to each part of it such credit as they believe it to be fairly entitled to receive. Neither side of the account in such a case is conclusive evidence of the facts which it discloses. The evidence presented by either side may be rebutted and overcome by testimony aliunde, and the triors of the fact may and should determine the question at issue for or against the evidence contained in the account as in their opinion the preponderance of all the evidence in the case and the rules of law require. 1 Jones on Law of Evidence, § 295; Walden v. Sherburne, 15 Johns. 409, 424; Veiths v. Hagge, 8 Iowa, 163, 174; Gildersleeve v. Landon, 73 N. Y. 609. The cigar store account, therefore, was prima facie evidence of the receipt by the bank, on account of the bonded goods and on account of the cigar store, of the items upon its credit side, and prima facie evidence of the payment by the bank, upon the same account, of the items on its debit side. But, as there was much other evidence upon this subject, it was not conclusive proof of either fact, and neither the master nor the court was required to give the same credence and effect to the self-serving statements on the debit side that they gave to the admissions against interest upon the credit side of the account. The effect of the application of this rule of law to the evidence in this case will be considered later in this opinion, after the effect of the other specifications of error which affect the master's statement has been determined.

The second specification of alleged error made by the bank is that the master and the court below found that the cigar store was sold for $21,000, when the fact was that the selling price was only $19,900. This specification is without foundation in fact, because the account of the master shows that the amount charged against the bank on account of this sale was only $19,541.66. There was, however, an error in the charge, which the master made against the bank, of $817.10 under date of March 25, 1887. This item was a check of S. N. Wood to Salomon, given to reimburse the latter for the payment of duties upon the bonded goods which he had made. This $817.10 is credited to the bank by the master in the item of $1,035.83 under the same date. The charge of the $817.10 offsets the credit to that amount, and the effect of it is to deprive the bank of any credit for this amount of $817.10, which it paid for duties on the goods. The debit side of the master's account should accordingly be reduced by the sum of $817.10.

The next complaint is that the master and the court below refused to credit the bank with $10,500 on account of imported cigars of that value, which the counsel for the bank insisted were placed in the cigar

store after it had been delivered to Salomon and just before he sold it. The bank also complains that the master refused, after the testimony was closed, to permit it to prove that these cigars were thus introduced into the store. The fact, if it be a fact, that these cigars were placed in the store, and the evidence offered to establish that fact, are alike immaterial, in the absence of any proof, and of any offer to prove, that these cigars were bought by, or were the property of, the bank. The decision of this court at the former hearing was that the cigar store and the bonded goods were the property of Simpson, and that the bank must account for their proceeds. If the bank, or its agent, Salomon, bought, paid for, and put into the cigar store, while it was in the hands of the latter, more cigars, the bank would undoubtedly be entitled to a credit for the amount which was realized from the sale of those cigars to Hyman, when it produced fair proof of the proportion of $19,541.66 which was obtained at the sale that was realized from the cigars which it bought and placed in the store. The burden, however, would in any event be upon the bank to establish these facts, and in the absence of proof of them the complainant would be entitled to all the proceeds of the stock. If the bank had purchased and mingled its own cigars with Simpson's, it would have done so at its peril. In the case as it stands, the proof utterly fails to show that the cigars in question were ever the property of the bank or of Salomon, or that either of them ever bought or paid for them. There is neither proof nor offer of proof of these essential facts. The probability is that, if any cigars were ever added to the stock in the cigar store during the incumbency of Salomon, they were the cigars of Simpson which have not been otherwise accounted for by the bank, and there was no error in the refusal of the master to credit it with their supposed value, nor in his refusal to permit it to prove that such cigars were placed in the store, in the absence of evidence that they were the property of the bank, or the property of any other person than Simpson.

On November 6, 1888, Simpson indorsed and delivered to the bank the promissory note of the Only Chance Mining Company for $5,000. At a later date such entries were made in the books of the bank as strongly indicate that the bank treated this note as paid by the surplus above $7,500 which it received from the sale of the real estate it had obtained from Simpson. It is assigned as error that no credit was given to the bank for the amount of this note. As the complainant did not attack the sale of the real estate to Wood for the sum of $7,500, and that transaction stands unimpeached, nothing was ever in fact paid upon this note, and credit for it should be given to the bank. The second note for $5,000 made by the Only Chance Mining Company was not indorsed by Simpson, and for that reason it was properly omitted from the charges against him.

Other specifications of error are that the master and the court below refused to receive in evidence the bill of sale and other documents and testimony which tended to show that the transfer of the cigar store to Salomon was a sale, and not a pledge, and that they did not hold that inasmuch as the cigar store account appeared to balance, and Wood testified that in 1889 he delivered up to Salomon the Only Chance Mining Company's notes, a complete and conclusive settlement of the

transactions between Simpson and the bank was thereby effected. But there was neither error of law nor mistake of fact in these rulings. The second hearing below was not a new trial of the issues which were presented at the first hearing. It was not a rehearing of the questions whether the transaction between Simpson, the bank and Salomon was a sale or a pledge, and whether or not the accounts between them had been conclusively settled in 1888 or 1889. Those issues were tried and adjudicated by this court upon the appeal from the first decree. That adjudication was the law of the case, and the only questions open at the second hearing were those involving the state of the account between Simpson and the bank and its agents, Wood and Salomon, who took and held the cigar store and the bonded goods in trust to pay Simpson's debt to the bank and to return the surplus to him. The former adjudication determined the issue whether the accounts between these parties had ever been finally rendered and settled. No correct account had ever been rendered, because the bank had never given to Simpson credit for more than $7,500, when he was entitled to credit for $19,541.66 on account of the cigar store; and, even if the question were open for consideration, the evidence does not satisfactorily sustain the claim that any settlement was ever made between these parties, even upon the erroneous theory upon which the bank originally insisted.

We turn to the complaints of Simpson. He insists that the charge against him of $2,000 for the services of Salomon in handling and selling the pledged goods is excessive, and that it ought not to be allowed to the credit of the bank. But Salomon took possession of, and with the aid of Simpson sold and collected the proceeds of, property of the value of more than $50,000. He did this with the consent and pursuant to the agreement made by Simpson with the bank. For these services the bank has paid him $2,000. The only question here is whether or not the services of Salomon were worth that amount. The master and the court below were competent, upon the disclosure of the facts that Salomon had rendered these services and that the bank had paid him for them, to determine their reasonable value, and their decision of this question should not be disturbed, in the absence of error of law or of mistake of fact. There is no evidence of either, and their finding upon this subject is affirmed.

The next complaint is that the bank was credited with the payment of $2,000 for the services of its attorney in defending the title to the bonded goods against an action brought by one Muro, who claimed to be the owner of them. The evidence is conclusive that the action was brought, that the bank retained the attorney to defend it, that he did defend it, and that his services were worth $2,000. The bank insists that on May 17, 1895, it paid the attorney this amount, and Simpson denies it. The evidence upon the question of payment is not very satisfactory. It is such that a finding either way could not be said to be without substantial support in the record. The master and the court below agree that the fee was paid, and that finding ought not to be disturbed, in view of the state of the evidence upon this issue, and of the fact that the issue involves nothing but interest upon the $2,000. It involves interest upon the $2,000 only, because, if the bank did not pay that amount to its attorney, the evidence conclusively shows that it

incurred the liability to pay it, and Simpson, who appeals to this court of equity for the proceeds of his property, ought, as a condition of the relief he seeks, to pay the liability of his pledgee necessarily incurred in defending the title to it. He who seeks equity should do equity.

The action brought by Muro was settled on January 19, 1893. But, according to the report of the master, there was in the coffers of the bank a surplus of the proceeds of the pledged property, after the payment of the debt of Simpson, at all times subsequent to the year 1887. It is assigned as error that in the statement of the account the bank is not charged with any interest upon this surplus from 1887 until the settlement of the Muro action on January 19, 1893. This balance, however, was derived from the sale of the goods to a large part of which Muro claimed the title. If he had succeeded in his action, the bank would have been required to pay to him the value of these pledged goods. It would have been relieved from paying their proceeds to Simpson. It would have been entitled to apply those proceeds to satisfy the claim of Muro. It was the surplus which the bank should receive after properly administering the trust, after defending the title to the pledged goods, and after paying the debt of Simpson, and that surplus only, which the latter was entitled to receive from the bank. It was impossible to determine whether or not there would be any surplus, and, if there should be, how much that surplus would amount to, until the action which Muro had brought was determined. Until that time nothing became due from the bank to Simpson, no action to recover the surplus could be maintained, and consequently no liability to pay interest upon the amount which the bank held in trust and had the right to retain, at least for a reasonable time, in order to dispose of the litigation against it, arose. The specifications of error regarding the interest cannot be sustained.

Reference has been made to all the specifications of error, and the result is that if the unexplained items on the debit side of the cigar store account should be disallowed, as they were by the master and the court below, the $22,061.93 which was found by them to be due from the bank to Simpson should be reduced by the deduction of $5,817.10 to $16,243.83 and interest from January 19, 1893. If, on the other hand, those unexplained items should be allowed and credited to the bank, a decree should be rendered in favor of the bank and against Simpson, because the aggregate of these items exceeds $16,243.83 by several thousand dollars. We return to the consideration of this, the most important question in this case.

The cigar store account was introduced before the master as a part of the evidence at the first hearing, from all of which this court deduced the finding that on March 2, 1887, Simpson owed the bank $33,-685.31, that he paid it $7,500 by the conveyance of his residence, and pledged to it to secure the remainder of his indebtedness bonded goods of the value of about $25,000 and a cigar store of the value of about $21,000, leaving the bank indebted to him on the face of this finding in the sum of about $19,814.69. 93 Fed. 310. The evidence at the former hearing, in other words, so strongly indicated that there was some amount of money due to Simpson on account of the pledged goods that in the opinion of this court it overcame the evidence of the

debit side of the cigar store account, and induced a finding to the effect which has been stated. It necessarily follows that when the counsel for the appellee, Simpson, introduced before the master all the evidence at the former hearing, he made a prima facie case to the effect that his client was entitled to recover about $19,000 from the bank, and the burden was placed upon the appellant bank to overcome this conclusion by means of the accounting. Does all the evidence, when fairly considered, establish the fact that the bank was not justly liable to pay to the complainant an amount approximating this sum? The case imposes upon the court the duty of answering this question, and it has been a difficult task to do so satisfactorily. The evidence is not so clear that it is possible to state an account with the certainty that every item in it is correct. If, however, when all the evidence is taken together, it indicates with reasonable certainty what the general balance of the account between these parties must have been on January 19, 1893, the court is not relieved of the duty of finding this amount and rendering a decree accordingly by minor doubts and uncertainties which the record leaves undetermined. If there was any probability that more or better evidence could be produced, the case might be returned to the master for farther testimony; but the witnesses have generally testified that they have now presented all the evidence under their control. Salomon, the chief actor in the drama, is dead. His books and vouchers have been destroyed, and there is no hope of a more satisfactory record from a prolongation of this litigation. This suit has been pending for more than a decade. Its continuance would serve only to deprive the ultimate victor of the benefit of the decree, and to inflict unnecessary loss upon the defeated. In view of these facts, all the testimony, including especially both sides of the cigar store account, has been carefully read and thoughtfully considered. Much of the evidence has been read many times, and an earnest effort has been made to justly determine the main issue remaining in this case—the issue whether the bank is justly indebted to Simpson for an amount approximating $16,000, or Simpson is indebted to the bank, as claimed by counsel for the latter, for tens of thousands of dollars. The established facts which persuade to the conclusion that has finally been reached upon this question will be briefly stated. No attempt will be made, however, to itemize the amounts to be mentioned, or to make them exact, because the significance of the facts is not in the specific amounts with which they deal, but in their general character and effect.

Conceding to the debit side of the cigar store account its effect as prima facie evidence, the case before the master opened, as we have seen, with that evidence rebutted and a prima facie case against the bank established for the recovery of about $19,000, based upon all of the evidence at the first hearing and the finding of this court thereon. When the subsequent evidence upon the accounting had been introduced, the fact was established, by the cigar store account and by the testimony of Simpson and Wood, that Salomon received from the pledged goods and deposited with the bank in that account about $55,000, and that out of this account he paid to Wood amounts which aggregated $24,-766.40 to pay the debt of Simpson, $7,543 to pay a note which Salomon gave to the bank when he took the cigar store, and $2,000 to Salomon

for his services in handling the pledged goods, leaving a balance of about $20,000, which the debit side of that account shows that Salomon had checked out for other purposes which are not established or indicated by the record. Now, the only other purpose to which this $20,000 could have been legitimately applied was to pay the necessary expenses of operating the store, which had a stock of about $20,000, for 23 days, and the reasonable expenses of selling the bonded goods, which were worth about $35,000. The fact that Salomon checked this amount of about $20,000 out of the bank through his cigar store account, and that it was charged to him in that account, does not seem to us to be convincing evidence that it was either reasonable, just, or necessary to expend so large an amount to dispose of property which realized only about $55,000. It is true that in the foregoing statement of the account, which finds the amount realized by Salomon from the goods he sold to be $55,000, the cigar store account and the testimony of Simpson that Salomon deposited the proceeds of his goods in that account, and that as the money accumulated he gave checks to Wood to apply on Simpson's debt and to run the business, has been esteemed sufficient proof, in the light of the other evidence in the case, that the unexplained items on the credit side of this account, which amount to about $23,000, represent proceeds of the pledged goods received by the bank from Salomon, while the debit side of that account is not given sufficient probative force to establish the proper expenditure of the unexplained items on that side of the account, which amount to about $20,000. But there are substantial reasons for this conclusion, derived from the relations of the parties and the other evidence in the record. The bank held these goods in trust as pledgee. It had the control of the goods, of its agent, Salomon, of the account of the sales, and of the expenditure of the moneys derived from them. Simpson had none of these things. He participated in, perhaps conducted, the negotiations for the sale of the goods under the supervision of Salomon; but he had no control of the account or of the moneys deposited in the bank. It was the duty of the bank to keep a correct account of the receipts from the proceeds of the trust estate, of the necessary expenses of selling it, to render this account to Simpson, and to pay to him the surplus remaining after his debt and the necessary expenses of turning the pledged goods into money had been paid. It kept an account with its agent, Salomon, but none with Simpson or with the trust estate. The credit side of this account is an admission against interest, while the debit side is a self-serving statement, and in the presence of other persuasive evidence upon this subject the former naturally induces more credence than the latter.

Again, this was not an account between a creditor and his debtor. In such an account the debtor himself generally orders the payment of, or receives, the items charged to him, and, if they are erroneous, he has the knowledge and the testimony to disprove them. It is not so in this cigar store account. This was an account between the bank, a trustee, and its agent, Salomon. So far as this record discloses Simpson had no knowledge, nor means of knowledge, of the purposes for which the $20,000 here in question was expended, or of the items through which it was drawn from the bank, while the latter, after the

money was deposited with it, had the power and was charged with the duty to see and to know how this fund was used.

Again, this account was written by the bank, if the testimony of its officers was true, at a time when they were acting upon the theory that Salomon owned the cigar store, and had the right to use its proceeds for his own benefit, or otherwise, as he saw fit. It may, therefore, well be convincing evidence that the unexplained items on its credit side were derived from the pledged goods and were deposited with the bank. But how can it be very persuasive evidence of the just application of $20,000 of these trust funds which are included in the unexplained items on its debit side?

There is another class of evidence in this case which strongly confirms the conclusion that the unexplained items on the credit side of the cigar store account represent the proceeds of the pledged goods, while those on the debit side do not represent a proper application of those proceeds to the discharge of the trust. It is the evidence of the action of the bank before this controversy had arisen. Neither the account of Wood nor the cigar store account shows any surplus or balance due to Simpson. The action of the bank demonstrates the fact that there was such a surplus. While in 1887 it was treating the transfer of the cigar store to Salomon as a sale, and was giving Simpson credit for only $7,500 on account of it, instead of allowing him a credit for its proceeds, $19,541.66, it nevertheless acknowledged full payment of Simpson's debt from the proceeds of the pledged goods on October 5, 1887. If upon that theory the debt was paid on that day, Simpson is now entitled to recover of the bank at least—

| | | |
|---|---:|---:|
| The amount of the certificate of deposit to Moffat, which he had bought with his property, and which the bank was holding for him | $ 4,314 | 69 |
| The difference between the $7,500 the bank had credited him for the cigar store and $19,541.66, its proceeds | 12,041 | 66 |
| The amount deposited in the cigar store account after October 5, 1887 | 5,683 | 99 |
| | $22,040 | 34 |
| Less the amount paid Salomon for his services........... $2,000 00 | | |
| The amount paid for the settlement of the Muro action and for the attorney's fees therein...................... 4,230 00 | | |
| And the amount of the Only Chance note................ 5,000 00 | | |
| Making in all......................................... | $11,230 | 00 |
| And leaving a surplus due him of...................... | $10,810 | 34 |

These considerations have forced our minds to the conclusion that the evidence clearly establishes the fact that the bank received about $55,000 from the proceeds of the pledged goods which were handled by Salomon. The receipt of this money by the bank charged it with a trust in favor of Simpson, and made the bank liable to him for every dollar of it which it did not lawfully expend in discharging its trust. Concede that the cigar store account is evidence that the bank paid out the $20,000 evidenced by the unexplained items on the debit side of the account upon the checks of Salomon. That fact is not enough to exonerate it. It must go farther and establish the fact that it paid this sum out either in satisfaction of the debt of Simpson to it or in dis-

charge of the necessary expenses of converting the pledged goods into money. The proof is plenary that Simpson's debt and Salomon's note and Salomon's services were paid with about $35,000 of this fund. But there is no evidence to show what was done with the other $20,000. The duties upon the goods, the freight, the insurance, the taxes upon them were paid by Wood and are credited to the bank in the master's account. If other duties, other freight, other taxes, other insurance, had been paid, the proof of it would doubtless have been forthcoming; for it would not have been difficult to obtain, and the witnesses for the bank have testified that they have produced all the evidence they could secure. There is nothing left to which this $20,000 could have been lawfully applied but the expenses of conducting this business, and it is too tense a strain on our credulity to believe that it was necessary to expend $20,000 to pay the expenses of converting cigars and tobacco worth only about $55,000 into money. The facts to which reference has now been made converge with compelling force to show that there was a substantial surplus of many thousand dollars remaining in the hands of the bank and of its agents after the debts of Simpson and all the legitimate charges against the proceeds of the pledged goods had been satisfied. While they do not disclose the exact amount of this balance, they indicate that it could not have been very far from the $16,243.83 to which the award of the master has been reduced by the specific exceptions which have been considered, and they leave little doubt that a reversal of that award and a finding of an indebtedness of Simpson to the bank would work substantial injustice.

In reaching this conclusion the books and accounts of the bank and the testimony of its officers and witnesses have not been disregarded, but they fail to convince that the bank has fairly accounted for the proceeds of this trust estate which the proof, in our opinion, shows that it received. In the first place, the account books of the bank were not written to show, but to conceal, the truth of this transaction. They did not disclose the fact that the deposit certificate to the president of the bank for $4,314.69 was the property of Simpson. They were not written to indicate, but to conceal, the fact that the cigar store was pledged to secure the debt of Simpson. The bank never made or kept any separate account of the receipts and expenditures on account of the pledged goods, as it was its legal duty to do. It mingled the amounts which Wood obtained from them with his individual funds, and permitted him to make his expenditures on account of them by means of checks on his own account, paid indiscriminately with those he drew to discharge his individual business obligations, so that there was no way to trace his receipts and expenditures on account of the trust estate, except by means of a tedious search for the items through his individual account, with the aid of his recollection and his vouchers. Even this account with Wood was not regularly kept, by entering all the items in it at the respective times at which the transactions to which they relate occurred. It contains a single credit on October 4, 1887, of three items; one of $5,117.30, March 25; one of $10,000, May 13; and one of $5,000 August 4, making in the aggregate $20,117.30. There were other errors in the books of the bank—one of $10,000 in Wood's account, one of $100.92, under date of December 15, 1887, in

the cigar store account, and one of seven items which made a difference of $4,604.95 in the profit and loss account. The entries in the latter account regarding the transaction in question in this suit, and the entries of certain notes on the discount ledger relating to Simpson's account, were written over erasures of entries that it was impossible to read. The officers and witnesses of the bank were unable themselves to make a true statement of the account between it and Simpson from their books and vouchers. Their knowledge and testimony concerning this subject have been neither uniform nor consistent. When they examined their books and made their answer, they stated an account on the theory that the cigar store was sold by Simpson to Wood for $7,-500. They gave Simpson credit on account of it for that amount only, and then showed a balance due to the bank of only $2,742.98. They had not then discovered apparently that they held a deposit certificate in the name of their president for $4,314.69, which, upon the theory of that account, had been purchased with the money of Simpson, and that he was entitled to additional credits of this $4,314.69 and of $12,-041.66, the difference between the $7,500 which they had credited him for the cigar store and the $19,541.66 which that store produced. After the decision of this court and the order for the accounting they stated another account, which disclosed a balance of $9,813.17 against Simpson, and before the testimony in the presence of the master was closed they presented a third account, in which the balance against Simpson appears to be $42,466.67. The last account includes items of $10,500 for cigars taken from the warehouse and put into the cigar store, and $22,230 for interest, which there first appear. One or more of the officers or witnesses for the bank testified that each of these three accounts was correct according to the books of the bank and according to the knowledge which the officers or witnesses had of the transactions. But the three accounts and the testimony in support of them demonstrate the fact that some of them must have been erroneous. There is nothing in all this evidence for the bank, including the debit side of the cigar store account, of sufficient weight and cogency to overcome the broad, controlling fact which the evidence establishes and which conditions the entire case—the fact that the bank has received from the pledged goods many thousand dollars for which it has not in any way accounted, save by the entries in the debit side of the cigar store account of unexplained items to the amount of about $20,000. There is no legitimate cause to which the expenditure of these items can be attributed under the evidence, except the expenses of operating the store for 23 days, such as rent and clerk hire, and the expenses of selling the bonded goods. The debit side of this account may be evidence of a reasonable expenditure for this purpose. Such a reasonable expenditure may have amounted to $1,000. An expenditure of this character of some amount must have been made. The probative force of the unexplained items in the debit side of the cigar store account cannot and ought not to be extended beyond this reasonable expenditure, in the absence of evidence of the exact amount paid out on this account, and this item of expenditure is accordingly fixed and allowed to the bank at the sum of $1,000. The record as it stands contains no evidence that will sustain a finding that it was either necessary, just, or right for the bank or its agents to ex-

pend more than this amount in the execution of its trust, in addition to the amounts heretofore credited to it, while it is convincing to the effect that the bank held all the amounts which it received from the pledged goods, above the sums it expended to administer the trust and to pay the debts of Simpson, charged with an express trust for the benefit of the complainant. The amount thus received by the bank above the expenses of the administration of the trust and the debts of Simpson is, therefore, found to be $15,243.83.

The decree below is accordingly reversed, and the case is remanded to the Circuit Court, with instructions to enter a decree in favor of the complainant, Simpson, and against the bank, for the sum of $15,243.83, with interest thereon at 8 per cent. per annum from January 19, 1893, and his costs to the time of these appeals. The bank may recover the costs of these appeals in this court.