The bill stated that the plaintiff had conveyed to the defendant, Battle, a certain lot of land, in the city of Raleigh, for the price of $700, for which he had taken the note of the said Battle without any security — that Battle afterwards conveyed this land to the defendant, Blake, as trustee, for the purpose of satisfying certain debts of the said Battle mentioned in the said conveyance; that the said Battle is now entirely insolvent, and has never paid his said bond nor any part of it. The bill states that these facts were well known to the defendant, Blake, at the time he received the said conveyance in trust from the defendant; Battle, claims that the plaintiff has a lien on the said land (183) for the said purchase-money, and prays that the said defendants may pay off and discharge the said purchase-money, or that the land may be sold for the satisfaction thereof.
The defendants' answer was filed — and the facts alleged in the plaintiffs' bill were substantially proved. *Page 141 
On 5 September, 1839, the plaintiff sold and conveyed to the defendant, Battle, the lot of ground mentioned in the bill, at the price of $700, payable on 1 January, 1840, for which Battle gave him his bond without any surety. Battle, by deed bearing date 3 August, 1841, conveyed the same lot of ground to Bennet T. Blake, the other defendant, in trust to sell and pay off certain debts due and owing by the said Battle to the individuals mentioned in the conveyance. Both these deeds have been duly proved and registered. The bill is filed to compel the defendant, Blake, to pay off and discharge the bond, given by Battle to the plaintiff for the land, upon the ground that the purchase-money is unpaid, and that in equity the plaintiff has a lien upon the land for the purchase-money.
That this is the doctrine of the English Court of Chancery, there can be no doubt. It is established by many authorities and running through many years of the judicial history of that country. I do not deem it necessary to refer to these cases at this stage of this inquiry. I shall have occasion to notice them upon another part of the case. The inquiry presented to us is, whether it is the law of North Carolina — has it ever been engrafted upon our system, of jurisprudence? And, if it has not, is its adoption necessary? Is it in harmony with that policy which the Legislature of our State has, by various enactments, pointed out? The Legislature of North Carolina, as such, commenced in 1715 — or rather in that year the various statutes, which had been enacted by the colonial authorities, were revised and collected into one (184) body, and our judicial history is coeval with it. During the long period of time which has since transpired, we have no record that this principle of the English Chancery law was ever noticed or recognized here, and not until the year 1828 was it brought under the action of our courts of justice. In that year the case of Wynne v. Alston, 16 N.C. 163, was decided in this court, in which the existence of this lien in favor of the vendor of land, was apparently recognized as the law. This case, under all the circumstances attending it, and which have since come to light, we do not consider as establishing the doctrine. Judge HALL, it is true, delivered his opinion as that of the Court, and so in truth it was, as Judge HENDERSON in the decree was in favor of the plaintiff. Chief Justice TAYLOR dissented, and gave an able opinion against the doctrine. It is to be remarked that Judge HALL states that he was not aware that the question had been *Page 142 
stirred in our courts before that suit. Divided as the Court were, the profession was nevertheless well warranted in considering it as establishing the doctrine; and, if it stood alone, and upon its own circumstances, as reported, we should so consider it, and, however much we might regret, would certainly consider ourselves bound by it. But we are not compelled to receive it at this time as authoritative on the subject. On the hearing of Kelly v. Terry (not reported), from Franklin, in which this lien was set up by the plaintiff, it was intimated by one of the counsel concerned in the case that it was supposed the principle was definitely settled by the case of Wynne v. Alston, when Judge HENDERSON observed that was not the case; he concurred with Judge HALL that the plaintiff was entitled to a decree, but did not concur with him upon this point; his opinion rested upon other grounds. The bill in Kelly v. Perry was dismissed, and Judge HALL, in delivering the opinion of the Court, appears himself not to consider the doctrine as settled. That case was before the Court in the year 1831, and was followed by (185) that of Johnson v. Cawthorn in 1834, 21 N.C. 32. In that case the Court distinctly lay it down that it is an unsettled question in our courts. The language of the Court is "the rules by which we are to be guarded are exceedingly different (referring to the English Chancery rules), according as the doctrine may or may not have been sanctioned by our predecessors. An adjudication by them is a precedent which we are bound to regard as evidence of the law, unless it can be shown conclusively to be erroneous." "Where there is no such precedent we then ascertain the true rules by the deductions of reason from settled principles." The Court had before them, the case of Wynne v. Alston — and yet they say there was no such precedent as was to them evidence of what the law is on the subject. We think, then, it may be safely assumed, that the vendor's lien upon land sold for the purchase-money has never been received as the law of this State; and the question is now an open one. Two of the Judges in the case of Wynne v. Alston dissented, and in that ofJohnson v. Cawthorn, the distinguished Judge, who delivers the opinion of the court, says "after several conferences we are unable to agree upon this general question, and, as a determination of it is not necessary in the present case, we must leave it, reluctantly leave it, in the state in which we find it." It is not difficult, however, to perceive the inclination of his mind, and how he would have decided, if a decision had been demanded by the case. Let us then proceed to the next inquiry. Ought this principle to be engrafted upon our chancery system? Is its adoption necessary to the safety of vendors. *Page 143 
and is it in harmony with the course of legislation pursued in this State? In our sister States different decisions have taken place. In New York the English doctrine is adopted (Garson v. Green, 1 John., Ch. 108), as between the vendor and vendee, and where there is no contract, express or implied, that the parties did not intend a lien. In Masachusetts [Massachusetts] no such lien exists in any case. In coming to a decision whether we ought to sanction the adoption of the principle here, let us examine its workings in England, and what is the present state of the question there? It is very certain that every rule (186) adopted by the courts, whereby the titles to real property shall be affected, should be plain and perspicuous, so that the citizen may know for himself what the law is — at least this is the theory of the law. A system, then, complex in its nature, and leading to uncertainty and confusion, ought not to be adopted, unless imperiously demanded, either by natural justice or necessity. In Mackreth v. Symmons, 15 Ves., 344, LordEldon reviews the whole of the English cases on this subject — he collects them and points out their disagreement with each other. Some of the authorities consider it as the result of a natural equity, that a man shall not be deprived of his property by a sale without receiving the price agreed on — and others referring it to the contract or understanding of the parties, that the lien should not exist. In Chapman v. Tanner, 1 Ver., 267, the earliest case on the subject, and decided in 1688, the bill is dismissed, because it was agree between the parties that the vendor should retain the title deeds — and it further appeared that he had taken no security. In Bond v. Kent, 2 Ver., 281, the vendor had taken a mortgage for part of the money and the parties' note for the balance. LordEldon admits that, though the argument had considerable weight, it was not conclusive against the vendor's lien for the residue not secured by the mortgage, and this opinion of his Lordship is expressed in 1818. InPollexen v. Moore, 3 Atkins, Lord Hardwick decided that the vendor had a lien upon the land sold for the purchase-money; but that it was an equity confined to the parties themselves, and not to be extended to third persons. This decision was made by one of the ablest chancellors that country, so fruitful in able lawyers in every branch of jurisprudence, has ever produced. This opinion of the chancellor is controverted by LordEldon, and denied to be correct, and is indeed overruled by many subsequent decisions. Elliott v. Edwards, 3 Bos. Pul., 181. So the case of Fowell v.Hulis, Ambler, 724, decided that if the vendor parts with the estate, and "takes a security for the purchase-money, there is no reason for *Page 144 
(187) a Court of Equity to assist him against the creditors of the vendee." That case was similar to the present. It was a suit to establish a lien in favor of the vendor against the trustees of an insolvent debtor. It was decided against the lien, because a receipt was endorsed on the deed for the purchase-money, and the vendor had taken the bond of the vendee for it. The former fact of the endorsement of the receipt was not relied on, and the opinion of the chancellor is explained as resting on the taking of the bond, as furnishing evidence that the vendor did not intend to rely upon his lien. Naim v. Prowse, 6 Ves., 752. In this latter case, Fowellv. Hulis is shaken, if not denied. The master of the rolls decided that there may be a waiver of the lien by taking a security, but it must be one "totally distinct and independent," meaning that not the taking of the security is evidence of the waiver, but the nature of the security. He then, to illustrate his idea, puts the case "of the mortgage of another estate, or any other pledge," as evidence of the waiver. To this, however, LordEldon, in Mackreth v. Symmons, says: "It must not, however, be understood that a mortgage taken is to be considered as conclusive ground for the inference that a lien was not intended"; a conclusion, he thinks, not dependent upon taking a mortgage or a pledge, but must be the result of the circumstances of each case as it may arise. The conclusion to which his Honor comes, is the expression of a strong regret, as to the condition of the question at that time in the English courts. His language is — "The more modern authorities upon this subject have brought it to this inconvenient state — that the question is not a dry question upon the fact, whether a security was taken, but it depends upon the circumstances of each case, whether the Court is to infer whether the lien was intended to be reserved, or that credit was given, and exclusively given, to the person from whom the other security was taken." So that it appears from this opinion of his Lordship, that the chancellor must be satisfied that when the bond of a third person is taken, the vendor (188) must have given his credit exclusively to him, before he can decide that the lien was waived by the vendor. In the commencement of the opinion the chancellor states that the question is one of very great importance, and regrets that, as to the waiver of the lien, "he can find no rule laid down in distinct and inflexible terms" — that if the question is made to depend, as it appears is now the settled doctrine of English chancery, though he still doubts, not on the taking of security by the vendor, but on the nature of the security taken, "it is obvious that a vendor taking a security can not know the situation in which he stands *Page 145 
without the judgment of a court — that the observation is justified by a review of the cases, from which it is clear, different Judges would have determined the same case differently, and if some of them had come before him, he could not have assented to them." This declaration is made by an English Chancellor, and one of the most distinguished among them, so late as the year 1808, nearly two hundred years after the occurrence of the first case, as a reported in Vernon. It sanctions fully the decision made in the case of Gilmore v. Brown, v. Mason, 191, where it is declared that the lien of a vendor for the unpaid purchase-money is a right which has no existence until it is established by the decree of a court in the particular case. Justice Story, in the 1st vol. of his commentary on Equity Jurisprudence, page 461, sec. 1215, says "a lien is not, strictly speaking, either a jus in re or a jus ad rem. It more properly constitutes a charge upon the thing." In commenting upon equitable liens, he admits that the doctrine of the vendor's lien upon the land sold does exist, and at page 416, sec. 1218, he observes: "It has often been objected that the creation of such a trust by a Court of Equity is in contravention of the policy of the statute of frauds. But whatever may be the original force of such an objection, the doctrine is now too firmly established to be shaken by theoretical doubts." This undoubtedly is true, so far as the Court of Chancery in England is concerned. There it has been established by repeated decisions of their ablest chancellors and highest tribunals. Here we are fettered by no such current of (189) authorities, and are at liberty to be governed in our decision, in the language of Judge GASTON, in the case of Johnson v. Cawthorn, "by the deductions of reason from settled principles." In discussing the question as to the evidence of the lien, Judge Story says the difficulty lies in determining what circumstances are to be deemed sufficient to repel or displace the lien or amount to a waiver of it. Upon the authorities, this is left in such a state of embarrassment, that it would have been better to have held at once that the lien should exist in no case, and that the vendor should suffer the consequences of want of caution, or to have laid down the rule so plain the other way, as not to require the aid of a court to tell the vendor and others how he stood, p. 470, s. 1224. Chief Justice Marshall, in the case of Bailey v. Greenleaf, 5 Peters, 231, yields that the doctrine in the English Courts of Chancery is well established, but it is evidently one which did not meet his entire approbation. At page 232 he remarks, however the equity may arise, "still it is a secret, invisible trust, known only to the vendor and vendee, and to those to *Page 146 
whom it may be communicated in fact. To the world the vendee appears to hold the estate divested of any trust whatever. A credit is given to him in the confidence that the property is his own in equity, as well as law. A vendor relying upon this lien ought to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is in some degree accessory to the fraud practiced on the public by an act which exhibits the vendee as the complete owner of an estate, on which he claims a secret lien. It would seem inconsistent with the principles of equity, and with the general spirit of our laws, that such a lien should be set up in a Court of Chancery to the exclusion of bona fide creditors. And he refers with approbation to the case from Ambler of Fowell v. Hulis. He concludes by observing that in the United States the claims of creditors stand on high ground — and to support the secret lien of a vendor against a creditor, who is a mortgagee, would be to counteract (190) the spirit of the laws made for the protection of creditors against secret trusts. To no State in the Union are the concluding remarks of the venerable Judge more applicable than to this — nowhere does the creditor stand upon higher ground — nowhere is his interest more sedulously guarded and particularly against secret trusts. All that the debtor has is subject to his claim. The fi. fa. reaches all his tangible property, and binds it from the test of the writ — all — all that he has shall be given to redeem his body — except the few articles secured by the insolvent law. By sec. 23, ch. 37, Rev. Stat., it is enacted by the Legislature, "That no mortgage, nor deed, nor conveyance in trust for any estate, real or personal, shall be good or available at law against creditors or purchasers for a valuable consideration, unless the same shall have been proved and recorded within six months after its execution; and, if not so proved and recorded, shall be absolutely null and void against such creditor" — and by the 24th sec. it is provided, "that no deed of trust or mortgage of real or personal estate shall be valid at law to pass any property, as against creditors or purchasers for a valuable consideration, but from the registration of such deed of trust or mortgage in the county where the land lieth — or, in case of chattels, where the donor, bargainor or mortgagor resides — or if he does not reside in the State, then in the county where the chattels or some of them are." There can be no doubt as to the policy of the Legislature in the enactment of this statute. It was to put an end to the many frauds, which might be practiced upon creditors and purchasers by secret deeds of trust and mortgages, by furnishing a convenient and sure mode in which might be discovered all the encumbrances *Page 147 
under which an individual held his property. It is not sufficient for a man to take a deed of trust or mortgage to secure his claim upon the property — he must, to render it available against creditors or purchasers, have it recorded — and the deed so recorded has no relation back, as other deeds have, to their delivery, but take effect only from the registration. And we have held that notice of an unregistered deed of trust will not affect a creditor. (191)Fleming v. Burgin, 37 N.C. 584. It may, therefore, be true that it is a natural equity, that when a vendor sells his land, that he should have a lien upon it for the security of his purchase-money. We think he ought; and the law tenders it to him in the shape of a mortgage or deed of trust properly registered. If he do not choose to avail himself of it, it is his own fault and if any one is to suffer from his negligence, the loss ought, in equity to fall on him. By refusing him the existence of this private equity, known alone to him and his vendee, or to those to whom they may choose to communicate it, which is so dangerous in its consequences to creditors and purchasers, we do not deny him the most ample security — one which, while it secures his interest, protects the community from fraud. Where, I would ask, is the value of this statute so far as sales are concerned, if the vendor can defeat its positive enactment by his original equity as it is termed? The law says he must take his security in writing, and have it registered. He does take it in writing, but does not have it registered. A question arises between him and a creditor of his vendee. The latter produces the act of Assembly; that fails to protect the vendor — all he has to do then is to throw himself upon his reserved right, and the Court is to enforce it. This, we think, would be a great absurdity. Shall we then introduce into our law a principle which, in its operation, is so inconvenient and uncertain, and has produced such a state of things in England as to induce one of its ablest chancellors to say that no man there can tell how he stands, until he has the opinion of a court — a principle so evidently fraudulent in its effects — so contrary to the plain policy of our legislative acts; or shall we cut up the mischief by the roots, by refusing to recognize this secret trust? We are satisfied as to the course our duty points out. We do not believe this secret trust ought to, or does, exist in this State. It is no part of the common law, and is borrowed by the English Chancellor from the civil law, and we believe that it would be in defiance of legislative (192) action, if we were so to decide. The bill must be dismissed without costs. *Page 148