BERNARD v. LEA.

In re AMERICAN FOUNDRY & SUPPLY CO.

(Circuit Court of Appeals, Fourth Circuit. November 4, 1913.)

No. 1,171.

1. COURTS (§ 405*)—CIRCUIT COURT OF APPEALS—ASSIGNMENT OF ERRORS—TIME FOR FILING.

The failure to file an assignment of errors before the allowance of an appeal, as required by rule 11 of the Circuit Court of Appeals (193 Fed. vii, 112 C. C. A. vii), does not deprive the appellate court of jurisdiction, and the appeal will not be dismissed because the assignment of errors was not filed until later, where there was a valid reason therefor.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1097–1099, 1101, 1103; Dec. Dig. § 405.*]

2. BANKRUPTCY (§ 455*)—APPELLATE PROCEEDINGS—MODE OF REVIEW.

An order of a District Court allowing a claim against a bankrupt estate and establishing a portion of it as a lien on property of the bankrupt is reviewable by appeal.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 916; Dec. Dig. § 455.*]

3. BANKRUPTCY (§ 467*)—APPEALS—MATTERS REVIEWABLE.

On an appeal under Bankr. Act July 1, 1898, c. 541, § 25a, 30 Stat. 553 (U. S. Comp. St. 1901, p. 3432), the Circuit Court of Appeals proceeds "as in equity cases" and may review findings of fact made by a referee or the District Court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 929; Dec. Dig. § 467.*

Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

4. BANKRUPTCY (§ 188*)—VENDOR'S LIEN—LAW OF NORTH CAROLINA.

Notes executed by a corporation for the purchase price of land conveyed to it at the same time, by a deed duly probated and recorded, although they described the consideration for which they were given, and there was a clause written below the signatures stating that they covered a vendor's lien on the land, did not create such a lien under the law of North Carolina, which will be enforced in equity as against the unsecured creditors of the corporation in bankruptcy, especially where there is no clear proof that there was any agreement to give a lien.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–289, 291–295; Dec. Dig. § 188.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. BANKRUPTCY (§ 172*)—LIENS—CORPORATION.**

    A deed of trust executed in the name of a bankrupt corporation by its officers to secure notes given to its president, neither notes nor deed of trust having been authorized or ratified by any action of the directors or stockholders, the intention being that the notes should be negotiated for the benefit of the corporation, which was never done, *held* not to create a valid lien against the property in favor of the president for an indebtedness which was owing to him.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 220; Dec. Dig. § 172.*]

Appeal from the District Court of the United States for the Western District of North Carolina, at Asheville; James E. Boyd, Judge.

In the matter of the American Foundry & Supply Company, bankrupt. Appeal by S. G. Bernard, trustee, from a decree establishing a lien in favor of H. G. Lea. Reversed.

T. J. Harkins, of Asheville, N. C. (Harkins & Van Winkle, of Asheville, N. C., on the brief), for appellant.

James H. Merrimon, of Asheville, N. C., for appellee.

Before PRITCHARD, Circuit Judge, and WADDILL and CONNOR, District Judges.

CONNOR, District Judge. [1] Upon a motion lodged by appellee to dismiss or affirm the judgment, the record discloses that the judge filed his decree on January 25, 1913. Immediately following his signature are the words:

    "The trustee excepts to the foregoing decree and, in open court, gives notice of his intention to appeal this matter to the United States Circuit Court of Appeals for the Fourth Circuit. Exceptions and appeal allowed, dated January 25, 1913." Signed by the judge.

No assignment of error was filed at that time. On January 29, 1913, the trustee presented to the judge a formal petition for appeal. In compliance with Rule 14, § 7 (193 Fed. ix, 112 C. C. A. ix), it was properly omitted from the printed transcript. A memorandum, "Petition for appeal, filed January 29, 1913. Citation dated Feby. 3, 1913. Service accepted Feby. 10, 1913," is in the transcript as required by the rule. At the time of presenting the "petition for appeal," the trustee filed his "assignments of error." Appellee insists that the appeal was taken and allowed, on January 25, 1913. He invokes Rule 11 (193 Fed. vii, 112 C. C. A. vii), which requires that the plaintiff in error or appellant shall file, with his petition, an assignment of errors.

    "That no writ of error or appeal shall be allowed until such assignment of error shall have been filed. * * * When this rule is not complied with, counsel will not be heard except at the request of the court; and errors not assigned according to this rule will be disregarded, but the court, at its option, may notice a plain error not assigned." Rules, 193 Fed. v, vii, 112 C. C. A. v, vii.

Appellee further insists that the appeal having been prayed for and allowed, on January 25, 1913, the judge of the District Court was without jurisdiction or power to make orders, or do any act, in the cause. The learned counsel for appellee strongly stressed this position and

cited authorities for its support. It is unquestionably true, as contended by him, that when an appeal has been taken, that is prayed for and allowed, the court is without jurisdiction to make further orders affecting the rights of the parties. Edmondson v. Bloomshire, 7 Wall. 306, 19 L. Ed. 91. It follows therefore that if the entry made by the judge, at the end of the decree of January 25, 1913, had the effect claimed by appellee, the action taken by the parties, and the judge, on January 29, 1913, was ineffectual for any purpose. The motion to dismiss, or to affirm, is based upon the assumption that filing the assignment of error, as required by rule 11 of this court, is jurisdictional and essential to taking an appeal. It must be conceded that cases may be found—some of them are cited by the learned and industrious counsel—which appear to, if they do not in fact, so hold. In Lockman v. Lang, 128 Fed. 279, 62 C. C. A. 550 (C. C. A. 8th Cir.), Judge Sanborn says that, when an appeal is prayed and allowed in open court, "the prayer for reversal and the citation may be waived, but the assignment of errors is indispensable to the perfection of the appeal." He bases this conclusion upon section 997, Rev. Stat. (4 Fed. Stat. Anno. p. 605 [U. S. Comp. St. 1901, p. 712]), and Rule 11 (C. C. A.); Lloyd v. Chapman, 93 Fed. 599, 35 C. C. A. 474. It will be observed that the language of rule 11 of the Circuit Court of Appeals is the same as Rule 35 of the Supreme Court (32 Sup. Ct. xiii). Section 997, Rev. Stat. requires that:

"There shall be annexed to and returned with any writ of error for the removal of a cause * * * an authenticated transcript of the record, an assignment of errors, and a prayer for reversal, with a citation to the adverse party."

This statute, it will be observed, does not prescribe the method of praying, the time for allowing, or making up the record upon a writ of error, and, as will be noticed later, makes no reference to appeals. They appear to be brought within its provisions by section 1012, R. S. (U. S. Comp. St. 1901, p. 716). It is found in the Judiciary Act of Sept. 24, 1789, c. 20, 1 Stat. 73. These matters were evidently left to be dealt with by the Supreme Court under its power to make rules of practice. In prosecuting and making up the record in writs of error, the provisions of section 997 should be complied with, but the order of procedure allowing the writ, or appeal, is not "essential to the perfection of an appeal." The question involved in the motion of appellee was considered by Judge Sanborn in Simpson v. First National Bank, 129 Fed. 257, 63 C. C. A. 371. After quoting the words of the statute (section 997), with the language of section 1012 (4 Fed. Stat. Anno. p. 624) "appeals" from the Circuit Courts and the District Courts " * * * shall be subject to the same rules, regulations and restrictions as are, or may be, prescribed in law in cases of writs of error," he says:

"The acts of Congress did not require the filing of an assignment of errors before the allowance of a writ of error or an appeal. This requirement rests upon Rule 11 of this court, which is the same, in terms and in effect, as Rule 34 (35) of the Supreme Court of the United States."

The learned judge proceeds to state the reason why the assignments of error should accompany the petition for a writ of error—they are

manifestly correct and, upon slight reflection, will so impress the mind of a lawyer. He proceeds to say:

"It is not so in case of an appeal. The right to appeal is an absolute right granted to the defeated party by the acts of Congress. No court or judge has any jurisdiction or power to condition the allowance of an appeal upon his consideration or determination of the question whether or not the applicant presents alleged errors which form reasonable grounds for the review of the decision below. That question is reserved for the consideration of the appellate court exclusively. The petitioner has the same right to the allowance of his appeal, in the absence of error, or of the appearance of it, as when he presents the most conclusive reasons for the belief that the decision against him was erroneous. * * * The result is that the assignment of error is not required to be filed before an allowance of appeal, for the benefit or information of the court to whom the application for the allowance is made."

He says that the only reason for requiring it to be filed at that time is that it may be made a part of the record for the information of opposing counsel and of the appellate court, "and that object, is as well attained by filing it at any time before the security is approved and accepted as by filing it before the order is made, etc." In that case, on June 23, 1902, both parties prayed, in open court, for an appeal. Defendants, on August 15, 1902, filed their assignments of error. As both parties appealed, the plaintiffs, on August 20, 1902, filed their assignments of error. The question presented here, therefore, was fairly raised and decided in that case. The court refused to dismiss, or affirm, and decided the case on its merits. Brown v. McConnell, 124 U. S. 489, 8 Sup. Ct. 559, 31 L. Ed. 495. We call attention, without undertaking to reconcile the two decisions, to the disposition made of Lockman v. Lang, supra, which was an appeal. The court said:

"The assignments of errors in this case were not filed until the seventh day after the appeal was allowed, and under Rule 11 and the uniform decisions of this court the appeal must be dismissed."

In that case the bankrupt also filed a petition for a writ of error, with assignments of error, and a bond. The petition was allowed by the judge; the Circuit Court of Appeals dismissed it, saying:

"A proceeding in bankruptcy is a proceeding in equity, and cannot be reviewed by a writ of error."

The failure to note the distinction made by Judge Sanborn in Simpson v. Bank, supra, has caused some, either real or apparent, conflict in the decided cases. Eliminating pro hac vice the act of Congress (section 697, R. S.), the question, both in respect to appeals and writs of error, involves a construction of Rule 11 of the Circuit Court of Appeals. It is apparent, upon an analysis of the language of the rule, that a failure to file assignment of error in cases in which a writ of error is the prescribed statutory method of securing a review of the judgment below, or in an appeal, does not invalidate the writ, or appeal, or prevent the court, into which it is returnable, from acquiring jurisdiction. After prescribing the time at, and manner in, which error shall be assigned in "an appeal or writ of error," the rule provides that:

"When this is not done counsel will not be heard except at the request of the court; and errors not assigned according to this rule will be disregarded,

but the court, at its option, may notice an obvious error." Sup. Court Rule 35; Circuit Court Appeals Rule 11.

If the requirement that the assignment of error shall be filed before the writ of error is allowed is jurisdictional, by what authority does the court request counsel to argue any question presented by the record, or obtain "the option to notice a plain error not assigned"? In School Dist. v. Hall, 106 U. S. 428, 1 Sup. Ct. 417, 27 L. Ed. 237, the court refused to grant a motion to dismiss a writ of error because the assignment of errors was not annexed to, or returned with, the writ, as required by section 997, R. S., holding that the provisions of the statute were not jurisdictional. In Farrar v. Churchill, 135 U. S. 609, 614, 10 Sup. Ct. 771, 773 (34 L. Ed. 246), after quoting the Stat. § 997, Mr. Chief Justice Fuller said:

"There is no assignment of errors annexed to the transcript of the record in this case, nor does the brief of counsel contain any specification of errors, such as is required by our rule. We shall not in this instance decline to consider what we suppose to be the errors relied on, but we call attention to this statute and the rule, in the hope that nothing more is needed to prevent its recurrence hereafter."

In Rowe v. Phelps, 152 U. S. 87, 14 Sup. Ct. 622, 38 L. Ed. 365, Mr. Justice Brown said that there was no assignment of errors, as required by the Stat. § 997, nor specification of errors in the brief, as required by the rule (21), and there is no such plain error, not assigned or specified, "as calls upon the court to exercise its option to review the questions involved." The writ of error was dismissed.

In United States v. Pena, 175 U. S. 500, 20 Sup. Ct. 165, 44 L. Ed. 251, Mr. Justice Brewer says:

"A third proposition is that no assignment of errors is annexed to the transcript, as required by sections 997 and 1012 of the Revised Statutes. But this is not sufficient to compel a dismissal of the appeal. * * * The court may, at its option, notice a plain error."

The case was considered upon its merits. In Old Nick Williams Co. v. U. S., 215 U. S. 541, 30 Sup. Ct. 221, 54 L. Ed. 318, affirming the judgment of this court, 152 Fed. 925, 82 C. C. A. 73, Mr. Chief Justice Fuller said:

"The assignment of error is not a jurisdictional requirement, and, although by the rule errors not assigned would be disregarded, the court might at its option notice a plain error not assigned or specified."

In that case this court, by an interesting and well-considered opinion, by Judge Morris, dismissed the writ because "not sued out six months from the entry of the judgment." He was careful, however, to say that the failure to assign error was not fatal to the writ of error. World's Columbia Exposition Co. v. Republic France, 91 Fed. 64, 33 C. C. A. 333.

The rule requiring assignments of error to be filed is a very wise one, vindicated by the experience of all appellate courts; but its enforcement is sometimes "pushed to an extreme," resulting in a denial of justice. With the limitation placed upon it, in Rule 11, the court retains the power to prevent this result. It makes the rule its servant and not its master. It is doubtful whether some confusion has not arisen by rea-

son of the failure to keep in mind the distinction between writs of error, always sued out in actions at law, and suits in equity which are always removed into the appellate court by appeal; in these cases the court examines the evidence, passes upon the facts, and makes such decree as in good conscience and the doctrines of equity the parties are entitled to. Babbitt v. Clark, 103 U. S. 606, 26 L. Ed. 507.

Without pursuing the question further, we are of the opinion that the appeal was "prayed and allowed" on January 25, 1913; that the assignments of error, filed on January 29, 1913, if necessary, are properly in the record. We are further of the opinion that, in no aspect of the case, should a motion to dismiss be allowed. We do not wish to be understood as putting a premium upon, or encouraging, a failure to comply with a very salutary rule. It should be observed. There are indications in this record that the judge was at another place than Asheville when he signed the decree, and, supposing that the trustee would desire to appeal, he, ex gratia speciali, certa scientia et mero motu, made the entry at the foot of his decree. This is not unusual. It would be to impose "hard lines" upon the appellant to permit the gracious act of the judge to deprive him of the right to present his contentions and have them passed upon by this court. In matters of practice, courts should look to substance rather than form and remember the maxim, qui hæret in litera hæret in cortice. Upon appellee's motion to affirm, it is our duty to examine the decree and the record to ascertain whether there is prejudicial error.

[2] Appellee insists, next, that the procedure adopted by the trustee, in bringing the case to this court does not conform to the provisions of the bankrupt law, as interpreted by the Supreme Court. The record shows that appellee filed his "claim and petition" before the referee, in which he set out the facts upon which he relies to establish an indebtedness of $5,330.14, with interest, against the bankrupt, and demanded that said amount be adjudged a lien on the proceeds of the sale of the property of the bankrupt in the hands of the trustee, etc. The trustee filed his answer and objections to the allowance of the lien. The referee heard the evidence and made his conclusions of fact and of law disallowing the claim. Appellee filed his petition for review, whereupon the referee certified the evidence, together with his conclusions, to the judge of the district, who reversed the referee in respect to the claim of $3,-400, due on account of purchase money of certain real estate sold by claimant to bankrupt. In respect to the remainder of the debt, he affirmed the referee. From this decree, as we have seen, the trustee appeals to this court. The procedure is in strict accordance with that adopted and approved by the Supreme Court, in Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008, and In Matter of Loving, 224 U. S. 183, 32 Sup. Ct. 446, 56 L. Ed. 725. Whatever doubt may have existed, and variant decision rendered, upon this question of procedure, prior thereto, must give way to these decisions which "blaze the way" so clearly that the profession and courts should have no further difficulty in respect to it. This conclusion is not in conflict with the decision of this court in Thompson v. Mauzy, 174 Fed. 611, 98 C. C. A. 457.

[3] We are thus brought to an examination of the merits of the controversy. The referee's findings of fact, so far as relevant to the view which we think disposes of the case, are:

"On July 22, 1911, H. G. Lea sold to the bankrupt real estate, situate in Buncombe county, N. C., for the price of $3,500, executing a deed therefor, bearing that date. To secure the payment of the purchase money, the bankrupt, on the same day, executed its notes payable to Lea, due and payable at different dates." Each note sets out, upon its face, the recital that it was "given as part consideration of the purchase price of the following described land" (giving a description thereof). Following the signature of the officers of the corporation are the following words: "This note covers a vendor's lien." Each note is indorsed "H. G. Lea." The deed was admitted to probate in Buncombe county October 2, 1911, and recorded on same day in the office of the register of deeds for said county.

"On September 20, 1911, O. R. S. Pool, secretary and treasurer of the bankrupt company, assuming to act for said company, executed in its name two notes, each for $10,000, payable respectively 8 and 12 months after date to the petitioner Lea, and, at the same time, a deed in trust was executed in the name of the bankrupt company, by W. F. Post, its vice president, and its execution was attested by said Pool, its secretary. This deed in trust was made to J. G. Merrimon, and, after describing the two $10,000 notes just referred to, states that 'it was given to secure their payment.' On September 20, 1911, claimant H. G. Lea was the president of the bankrupt company.

"The purpose of said Lea, Pool, and Post, in the execution of the notes and deed of September 20, 1911, was that they should be used by Lea to raise money for the bankrupt company, and it was agreed, between them, that if Lea did raise the money on said notes and deed in trust, he should be paid $5,000 out of the money so raised, the same to be in payment of the notes for $3,500, referred to in finding of fact No. 1, and the balance of $5,000 to be a payment on other indebtedness claimed by the petitioner Lea to be owing to him by the bankrupt company.

"Lea did not raise any money on the said notes and deed of trust, and the purpose for which the same were executed was not accomplished, and there was a failure of the consideration upon which said notes and deed of trust were executed.

"None of the directors nor any of the officers of the bankrupt company, other than the said Lea, Pool, and Post, had anything to do with the said notes or deed in trust, or had any knowledge of the same having been executed, until some time after the execution thereof.

"The execution of said notes and deed in trust has not been ratified by the bankrupt corporation, nor has it derived any benefit from the execution thereof."

All of the property of the bankrupt corporation, including the land conveyed by Lea, was sold by the trustee, free from liens and incumbrances; such liens as are found to be valid being transferred to the fund.

The referee found, upon the foregoing facts, as a conclusion of law, that:

"The petitioner Lea is not entitled to any security for any indebtedness due him by the bankrupt company by said deed in trust of September 20, 1911."

Appellee, in the specifications, set out in his petition for review, averred that the referee was in error in his findings of fact, and further that he failed to find additional facts which, he insisted, were essential to a correct conclusion in respect to the law. The trustee filed a statement averring that he was content that the case be submitted upon the findings of fact made by the referee, but that there

were several issues, material to the rights of the parties, raised by the petition and answer, and supported by the evidence, upon which the referee made no findings of fact or conclusion of law. He suggests that, if in the opinion of the court such findings were necessary, the matter be referred, etc. The District Judge did not make any ruling upon the claimant's exceptions to findings of fact, nor did he specifically affirm, or otherwise refer to, the findings made by the referee. The language of the decree, in so far as it is relevant to the question involved, is:  .

"This cause coming on to be heard, upon the petition or application of H. G. Lea to review the order of the referee in bankruptcy, * * * and being heard, it is ordered and decreed that the order of the said referee be, and the same is, so far reversed, as to allow the said Lea a lien upon the said assets or moneys in the hands of the said trustee, to the extent of $3,500, the amount of the purchase money of the lands mentioned and described in the petition of said Lea, and interest on said sum from the 20th day of September, 1911, until the date of the trustee's sale, and that said lien be a first lien to be paid and discharged in full, in preference to the claims of unsecured creditors."

While not essential to the decision of this appeal, it is proper to note that Mr. Covington, of Summit, Miss., intervened in the bankrupt court, claiming that he was the owner, by assignment from Mr. Lea, of the notes for $3,500 in controversy. To meet this claim, which was controverted by Mr. Lea, the judge directed that the amount, adjudged to Mr. Lea, be paid to his attorney, and held by him until the claim of the intervenor was decided. In the absence of any reference, by the judge, to the findings of fact, we assume that he affirmed them and that his judgment expresses his dissent from the conclusion of law. In the argument before us, counsel strongly urged their conflicting views of the facts which they claimed should be found, as the basis of our judgment. In exercising the jurisdiction conferred upon this court by section 24b, "to superintend and revise," we are confined to matters of law; whereas in appeals we are to hear and determine them, "as in equity cases." Section 25, Bankrupt Act (Act July 1, 1898, c. 541, 30 Stat. 553 [U. S. Comp. St. Supp. 1911, p. 3432]); Judicial Code, § 130 (Act March 3, 1911, c. 231, 36 Stat. 1134 [U. S. Comp. St. Supp. 1911, p. 194]). This language conferred upon the court the power, with the consequent duty, to treat the "whole case as open," as in appeals in equity cases, except as to facts determined by a jury. Elliott v. Toeppner, 187 U. S. 327, 23 Sup. Ct. 133, 47 L. Ed. 200. In First National Bank v. Title & Trust Co., 198 U. S. 280, 291, 25 Sup. Ct. 693, 697 (49 L. Ed. 1051), it is said:

"But this was an appeal and not a petition for revision, and hence it was that the Circuit Court of Appeals reviewed the questions of fact and declined to accept the findings of the referee and the District Court. In the exercise of supervisory power, it would have been confined to matter of law." Collier, Bankruptcy (9th Ed.) 535.

The evidence is sent up and printed in the transcript. In the view which we take of the case, the vital points are within a much smaller compass than counsel seemed to think. No question in regard to a voidable preference is involved, hence it becomes unnecessary to inquire

whether the corporation was insolvent on September 20, 1911. For the purpose of adjudication, that question passed into the judgment—this also eliminates the question whether the notes for $10,000 each, of September 20th, were given for a present consideration, or pre-existing debts. Proceeding, therefore, to the aspects of the case upon which the decision must rest, two questions are presented:

[4] 1. Has the claimant any equitable lien upon the real estate conveyed to the bankrupt company, independent of the notes and deed in trust of September 20, 1911? The claim of priority, in this respect, is dependent upon section 64b, "debts owing to any person who, by the laws of the states or United States, are entitled to priority." The question, therefore, is whether, under the laws of the state, the claimant had any equitable right to have the notes, executed for the purchase money, paid out of the proceeds of the land, in preference to the general creditors of the bankrupt. The referee finds that the title to the land vested, on July 22, 1911, the day upon which the deed and notes bear date. The claimant controverts this finding and insists, in his eighth specification, that he should have found that, on said day, claimant "contracted to sell, and the corporation to buy, the real estate at the price of $3,500, but that the said agreement was not fully executed until the execution by the bankrupt of the deed of trust in question to J. G. Merrimon, * * * and that it was a part of the contract of sale and purchase of said real estate that your petitioner should have a lien upon said real estate to secure the purchase price of the same." The record shows that, at a meeting of the directors of the company, held on April 19, 1911, a resolution was adopted accepting "the offer of H. G. Lea to sell the land for site upon which to erect the buildings." The terms of the sale, respecting the amount and due date of the notes for the deferred payment, are set out in the resolution; no reference is made to any security therefor. The deed bears date July 22d, and the notes were executed and delivered on that day. Mrs. Lea resided in Mississippi, and the deed was signed by her, and probated there. It was admitted to probate in Buncombe county and recorded there October 2, 1911. It also appears that Mr. Lea, who had resided in Mississippi, was under the impression that he held a vendor's lien for the purchase money. This is shown by the form of the notes and his testimony. The weight of the evidence contradicts the contention of claimant that, at the time of the contract to purchase, there was any agreement that a mortgage was to be executed to secure the payment of the purchase money. . Several of the directors say that there was no such agreement, and some of them say that it was understood that Mr. Lea was to take stock for the purchase money, that the notes were only given to be used temporarily for the purpose of enabling him to raise money to pay for the land.

The learned counsel for claimant concedes that the "vendor's lien" does not exist in this state. Johnson v. Cawthorn, 21 N. C. 32, 27 Am. Dec. 250; Womble v. Battle, 38 N. C. 182; Lumber Co. v. Lumber Co., 150 N. C. 282, 63 S. E. 1045, 21 L. R. A. (N. S.) 843. If it be conceded that there was an agreement to give Lea a mortgage on the land, we do not perceive how that could affect the rights of the trustee

in bankruptcy. Conceding further that the title did not vest in the corporation until the deed was admitted to probate and registration, at which date it was delivered—that is "duly executed"—it follows that, at that date, as between the parties, and as against all persons having prior liens, the title was perfected in the company and passed to the trustee upon its adjudication July 20, 1912. We are unable to perceive any view in which the claimant Lea had any equity or equitable title in, or in regard to, the land after the delivery and registration of the deed. There is no statute, nor any line of decisions, conferring or recognizing any such right or equity. The registration is in lieu of livery of seisin and perfects the title. Rev. § 979. It does not appear when the deed was delivered. The date of probate will be adopted.

[5] 2. Has the claimant any liens upon, or right of priority in respect to, the proceeds of the sale of the land under, or by virtue of, the deed in trust executed to Mr. Merrimon to secure the two notes of $10,000 each, dated September 20, 1911?

The claimant is met at the threshold of this contention by the fatal fact that the notes and mortgage were never, either in their inception, or by ratification, the act and deed of the corporation. The evidence, in this respect, is uncontradicted. Mr. Lea was, on September 20, 1911, the president of the corporation. He says:

"No meeting was held for the purpose of authorizing this $20,000 mortgage and notes. No specific meeting was ever called to authorize the mortgage, and I do not know of any meeting of directors or stockholders being called or held to sanction the mortgage."

Mr. Post, the vice president, says:

"There was no meeting of the directors called to execute that mortgage. * * * I don't think there was any meeting called after the execution of the mortgage, or any meeting held at which the execution of the mortgage was ratified. There was no meeting called to ratify the mortgage either before or after it was executed. I don't think the mortgage was ever considered at any meeting, either before or after it was executed."

Mr. Pool, secretary and treasurer, a witness for claimant, says:

"No regular meeting was held or called to ratify this mortgage."

Mr. English, a director, says:

"The first I ever heard of the mortgage for $20,000, executed by the company to H. G. Lea on September 20, 1911, was along in December."

Mr. J. G. Merrimon, who was named as trustee, says that he has no recollection of the deed. The referee's finding, in respect to the execution of the mortgage, was clearly correct.

"The power of directors belongs to them collectively and not individually. The fact that a person is a director gives him no authority to act for the corporation, except when acting as a member of the board, in the absence of a by-law conferring special authority upon him." 21 Am. & Eng. Enc., 864.

"Directors of a corporation can act as such, so as to bind the corporation, only as a board; the acts of directors individually, though such individuals may constitute a majority of the board, cannot affect the corporation." Id. 865.

This has been uniformly so held, as law, in North Carolina, Duke v. Markham, 105 N. C. 131, 10 S. E. 1017, 18 Am. St. Rep. 889, in

which a mortgage on the corporate property, although a majority of the directors individually assented to its execution, was held void. Benbow v. Cook, 115 N. C. 325, 20 S. E. 453, 44 Am. St. Rep. 454.

In Hill v. Railroad, 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606, it was said:

"It is therefore essential to the validity of their acts that they (directors) should be assembled in their representative capacity, as they are not permitted to discharge any of their duties unless thus organized into a deliberative meeting, though they may all have personally and individually given their assent to any proposed corporate action."

Cook on Corporations (6th Ed.) 2254, says:

"Directors are elected to meet and confer, and to act after an opportunity for an interchange of ideas. They cannot vote or act in any other manner."

It is manifest, therefore, that, independent of the purpose for which the notes were given, the attempted execution of the deed in trust to Mr. Merrimon was ineffectual to vest the title in him or to create any valid lien upon the land. The learned counsel says that, conceding this to be true, the parties are in a court of equity, and that upon "broad principles of equity" the lien should be declared and given priority for the purchase money. As we have seen, the claimant has no "vendor's lien." To the suggestion that it was the intention of the parties to secure the payment of the purchase money, and that a court of equity will disregard form and effectuate the intention of the parties, it is manifest that there is a very decided conflict in the evidence as to what was the intention of the parties in the execution of the notes and mortgages. Mr. Lea says:

"I was under the impression that a man could retain title for the deferred payments until they were made, but I found out that that could not be done."

Mr. Sternberg was present, when the contract was made, to buy the land. He says:

"There was nothing said at that time about any mortgage or security to be given for these notes. He wanted the notes to pay Mr. Weaver."

W. F. Post, a director, was also present. He says:

"I cannot say whether at that time anything was said about a mortgage to secure these notes. * * * I think these $3,500 notes were vendor's lien notes, and, if I could see them, I could tell you more about them."

Mr. Litchenfels, another director, was present, and says that the directors were talking about buying another piece of land, when Mr. Lea said that he had something better.

"He said that he had a piece of property that he would sell the company for $3,500 and take stock for it. Notes were to be given him for three months in order to enable him to pay Mr. Weaver and Mr. English was to buy another part of the property. They were to give him notes, and when the notes became due he was to take stock for them, * * * that he would have the money at the expiration of the notes, etc."

Mr. Pool says:

"Mr. Lea has never been paid for this land. He agreed to sell us the land and give us three years to pay for it, and he was to be secured by a mortgage

210 F.—38

on the land. * * * Mr. Lea never agreed to take stock from the company for his land; I cannot be mistaken about that."

Mr. Lea was president of the bankrupt company from July 20, 1911, until it was adjudicated bankrupt. He denies that he was to take stock for the land.

It would be very difficult for a chancellor, in a suit between the parties to the transaction, upon this evidence, to find that there was any agreement on the part of the company to execute a mortgage on the land to secure the purchase money. The resolution, authorizing the purchase, spread on the minutes, while very explicit as to the terms of the purchase, fails to make any reference to security. Does the circumstance under which the mortgage of September 20, 1911, was executed, afford any basis for equitable relief? It clearly does not come within the equitable principles by which courts of equity aid the defective execution of powers. The evidence, in respect to the agreement upon which the $10,000 notes and deed in trust were executed, is somewhat confused. Mr. Lea says:

"They gave me two notes for $10,000 each, and, if possible, I was to negotiate that mortgage and take up the Sternberg mortgage (for $15,000), $5,000 represented the amount I had advanced, and I had an open account with them. It was agreed that, if I could make that loan, they would pay me $5,000. That was how they came to execute the $20,000 mortgage. * * * I failed to negotiate the paper."

On cross-examination, he is asked the question:

"Now, Mr. Lea, tell us about this mortgage of yours for $20,000, securing two notes, $10,000 notes?"

He answers:

"The company was indebted to me around $11,000, $700 of which I had just let them have, thinking temporarily, so I said to Mr. Pool and Mr. Post 'that I believe I can get you—the buildings were practically completed—a first mortgage on this property, a $20,000 loan, at least $10,000 of which, if I can put it through, I will turn over to the company. They can apply it to Mr. Sternberg's indorsement, the notes that he had indorsed, and if I succeeded in getting that, I can arrange the other $5,000, and we will cancel the mortgage altogether, leaving this $20,000 first mortgage on the property.' In the $20,000 was included the $10,000 that the company owed me, $10,000 I was to get for them if I could. I failed to negotiate that paper. I was not successful about handling it, that is, on a satisfactory basis, and that is the history briefly stated."

He says:

"I did not include those $3,500 notes in the proof of claims I filed."

Mr. Post says:

"I suppose it (the mortgage) was to be null and void if he could not carry out the purpose."

Mr. Pool says:

"We agreed with Mr. Lea to give him $10,000 if he could negotiate all the notes. He said he did not expect to hold us up, and that he would take $5,000."

Mr. Sternberg says:

"After the petition in bankruptcy was filed Mr. Lea told me 'that the mortgage was only a scheme mortgage, Mr. Pool told me so. He told me he wanted to raise the money, to take up my mortgage and that, if he could not raise the money, the mortgage was null and void.'"

Upon this testimony, it is by no means clear what was in the minds of Mr. Lea, the vice president, who executed, and the secretary who attested his signature to the mortgage. No other director had any knowledge of the execution of the notes and mortgage. There are many other facts and circumstances found in the record, surrounding Mr. Lea's dealings with the property of this company, which would cause a court of equity to pause before decreeing to him a first lien on the land, to the detriment of creditors. Certainly there is no such weight of evidence as would induce a court of equity to conjecture just what their purpose was, and to enforce it. Equity seeks to effectuate the intention of parties to contracts, and will, to that end, aid their defective execution; but this is done upon well-settled rules and principles, found by experience to be wise and safe. The chancellor may not proceed when the evidence is unsatisfactory or the rights of innocent creditors are involved. After a careful and anxious examination of the evidence, we are brought to the conclusion that the judgment of the referee, either upon the facts found by him or, as we find them, was correct. The judgment of the District Court must be reversed. It will be so certified to the end that further proceedings may be had in the bankrupt court in accordance with this opinion.

Reversed.